**Albert A. LIST, Plaintiff-Appellant,**

**v.**

**FASHION PARK, INC., et al., Defendants,**

**Louis C. Lerner, individually and as doing business under the firm name and style of Lerner & Company, and as a Director of Fashion Park, Inc., et al., Defendants-Appellees.**

**No. 76, Docket 28986.**

United States Court of Appeals Second Circuit.

Argued Nov. 9, 1964.

Decided Jan. 4, 1965.

---

458

Before SWAN, WATERMAN and MOORE, Circuit Judges.

WATERMAN, Circuit Judge:

Plaintiff brought suit in the United States District Court for the Southern District of New York, seeking damages of $160,293 from numerous individual, partnership, and corporate defendants. The suit was based upon alleged violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b),[1] and Rule 10b-5, promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5.[2] Two of the defendants moved for summary judgment, but the motion was denied by Judge Wyatt in an opinion reported at 222 F. Supp. 798. The case was subsequently tried before Judge Cooper sitting without a jury. At the close of plaintiff's evidence, plaintiff took a voluntary non-suit as to some of the defendants, including Fashion Park, Inc. When the entire trial was completed, Judge Cooper, in an opinion reported at 227 F.Supp. 906, dismissed the complaint as against the remaining defendants.

The crucial facts of the case are for the most part undisputed. Fashion Park is a manufacturer and distributor of men's clothing with headquarters in Rochester, New York. The company had not been prospering for several years preceding the events of this suit, and its factory employees were working only part-time. In September and October,

O'Brien, Driscoll & Raftery, New York City (Arthur F. Driscoll, Edward C. Raftery, Milton Rosenblum, New York City, of counsel), for plaintiff-appellant.

Leonard I. Schreiber, New York City, for defendant-appellee Louis C. Lerner.

Baer, Marks, Friedman & Berliner, New York City (William E. Friedman, New York City, of counsel), for defendants-appellees H. Hentz & Co. and William P. Green.

1. "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
   (1) to employ any device, scheme, or artifice to defraud,
   (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
   (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
   in connection with the purchase or sale of any security.

1960, the manager of the union which represented Fashion Park's employees warned the president and the chairman of the board, Fashion Park's majority shareholders, that he would take a substantial number of employees away from Fashion Park if he could induce another clothing manufacturer to settle in Rochester. In response to this threat, the president of Fashion Park called a directors' meeting for November 4, 1960. Among the directors who attended was defendant Lerner, a minority shareholder.

At the meeting the union manager reiterated his plan to withdraw 300 to 350 employees, and urged the board to consider selling Fashion Park. He told the board that he knew of someone who might be·interested in buying the company, but he neither disclosed the name of his prospective purchaser nor any potential purchase terms. The directors then adopted a resolution to the effect that the company seek to negotiate a sale or a merger. Ten days later, the union manager revealed to the president of Fashion Park that the prospective purchaser was Hat Corporation of America, but this information was not relayed to defendant Lerner until the following month. Negotiations between Fashion Park and Hat Corporation began on November 22, 1960, a preliminary understanding was announced on December 7, 1960, and the formal contract of sale was signed on February 3, 1961. By one of the contractual provisions, Hat Corporation agreed to offer $50 per share to all minority shareholders of Fashion Park.

Plaintiff, an experienced and successful investor, had purchased 5100 shares of Fashion Park stock in January, 1959 at $13.50 per share. About November 11, 1960, with the advice of his broker, he authorized the sale of his stock at a net price to him of not less than $18 per share. At that time, defendants Lerner and H. Hentz & Co., as well as another director of Fashion Park, were bidding for Fashion Park stock through the National Quotation Bureau sheets. Plaintiff's broker knew that two directors were bidding for the company's stock, but he did not think it important to disclose this fact to plaintiff, and plaintiff had not sought to learn whether Fashion Park directors were bidding for the stock.

On November 16, 1960, plaintiff's broker called H. Hentz & Co. to invite a purchase of plaintiff's stock at $20 per share. Defendant William P. Green, the partner in H. Hentz & Co. who handled the transaction, contacted Lerner and Beaver Associates to ask if they would like to participate in the purchase. (Green and his brother, defendant Bernard A. Green, are partners in Beaver Associates.) After intensive negotiations between plaintiff's broker and William P. Green, and among Green, Lerner, and Beaver Associates, the sale of the 5100 shares was consummated on November 17, 1960 at $18.50 per share. 4300 shares went to Lerner, 400 to William P. Green and his daughter, and 400 to Beaver Associates. Within two weeks after the transaction, Lerner disposed of part or all of his interest in 3137 of the shares, at an average profit of about $1 per share. At the time of the transaction, William P. Green knew that Lerner was a director of Fashion Park; he may not have known of the resolution of November 4, 1960 to sell or merge the company. Neither plaintiff nor his broker knew that H. Hentz & Co. were brokers for a Fashion Park director who was one of the purchasers of the stock, or that the company's management was considering the sale of the company.

Plaintiff brought suit on February 24, 1961, claiming the difference between the price ($18.50) at which he sold his 5100 shares of Fashion Park stock and the price ($50) which Hat Corporation subsequently offered to Fashion Park's minority shareholders. He alleged that defendants had conspired to buy his stock and then to sell it at a substantial profit, and that they had failed to disclose to him material facts in their possession which would have affected his decision to sell his stock. Insofar as is pertinent to this appeal, the undisclosed facts, alleged to be material, upon which plaintiff

relied to support his allegations, were that one of the buyers of his stock was a director of Fashion Park, and that the Fashion Park board, with a potential purchaser on the horizon, had resolved to sell or merge the company. In the opinion dismissing the complaint, the trial court held that there was insufficient evidence of a conspiracy, that plaintiff would have sold even if he had known that one of the buyers was a director of Fashion Park, and that the undisclosed possibility that Fashion Park might be sold was not a material fact.

■ Plaintiff appeals from the decision of the trial court rejecting his claim that he was damaged by defendants' non-disclosures. He also appeals from the dismissal of his claim that there was a conspiracy among defendants, but he apparently relies upon this ground only if we choose to reverse the other adverse holdings of the trial court. Finally, upon appeal, he now alleges for the first time that defendants impliedly misrepresented to him that the stock he sold was worth only $18.50 per share. We affirm the decision of the trial court rejecting the claim that plaintiff was damaged through defendants' non-disclosures. Therefore we need not independently review the dismissal of the claim that there was a conspiracy to damage him. As for the allegation of misrepresentation, we decline to consider a claim not presented to the trial court which raises substantial issues of fact, requiring resolution, such as the ascertainment of the true value of plaintiff's shares on November 17, 1960.

■■ The general principles governing suits such as this were definitively set forth in the often cited case of Speed v. Transamerica Corp., 99 F.Supp. 808, 828–829 (D.Del.1951), aff'd, 235 F.2d 369 (3 Cir. 1956):

"It is unlawful for an insider, such as a majority stockholder, to purchase the stock of minority stockholders without disclosing material facts affecting the value of the stock, known to the majority stockholder by virtue of his inside position but not known to the selling minority stockholders, which information would have affected the judgment of the sellers. The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. It is an attempt to provide some degree of equalization of bargaining position in order that the minority may exercise an informed judgment in any such transaction."

Moreover, "a broker who purchases on behalf of an insider and who has knowledge of inside information would seem to be under the same obligation to disclose as the insider who purchases directly." III Loss, Securities Regulation 1452 (2 ed. 1961).

■ At the outset, defendant Lerner contends that the courts have never applied Rule 10b-5 in a civil suit involving total non-disclosure. By "total non-disclosure" defendant presumably means that there was no significant communication bearing upon value by buyer to seller except for offer, counteroffer, acceptance, or rejection. The trial judge made no findings relative to this contention, but we are prepared to assume with defendant that, in the sense defendant uses the term, there was a total non-disclosure by defendants to plaintiff.

Although there may be no square holdings in civil suits under Rule 10b–5 involving total non-disclosure, there are ample dicta to the effect that "lack of communication between defendant and plaintiff does not eliminate the possibility that Rule 10b–5 has been violated." Cochran v. Channing Corp., 211 F.Supp. 239, 243 (S.D.N.Y.1962); see Speed v. Transamerica Corp., supra, 99 F.Supp. at 829. Apparently there are no dicta to the contrary in any of the cases. Furthermore, in the leading case of Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909), the Supreme Court found common law fraud by an insider in the purchase of stock from a minority shareholder, even though "perfect silence was kept" by the defendant. Surely we

would suppose that Rule 10b–5 is as stringent in this respect as the federal common law rule which preceded it. III Loss, Securities Regulation 1448–49 n. 10.

■■ The doctrine for which defendant Lerner contends would tend to reinstate the common law requirement of affirmative misrepresentation. Such a tendency contravenes the purpose of Rule 10b–5 in cases like this, as enunciated in Speed v. Transamerica Corp., supra, which precludes not only the conveyance of half truths by the buyer which actually misled the seller, but, as well, failure by the buyer to disclose the full truth so as to put the seller in an equal bargaining position with the buyer. Moreover, the effect of adopting such a doctrine would be automatically to exempt many impersonal transactions. This effect would be contrary to the intent of Congress, as set forth in Section 2 of the Securities Exchange Act, 15 U.S.C. § 78b, which was to regulate "transactions in securities as commonly conducted upon securities exchanges [as well as] over-the-counter markets." But see III Loss, Securities Regulation 1455–56.

It may well be that suits under Rule 10b–5 involving total non-disclosure cannot be brought pursuant to clause (2) of the rule. III Loss, Securities Regulation 1439. Contra, Speed v. Transamerica Corp., supra. Perhaps, as defendant Lerner contends, they cannot be brought pursuant to clause (1) either. Joseph v. Farnsworth Radio & Television Corp., 99 F.Supp. 701, 706 (S.D.N.Y. 1951), aff'd 198 F.2d 883 (2 Cir. 1952). Contra, III Loss, Securities Regulation 1439. But we fail to see that it makes any difference which clause of Rule 10b–5 is relied on by plaintiff, and no reason for requiring a choice here has been pointed out to us.

■ Because there is much disagreement and confusion among the parties concerning the meaning and applicability of "reliance" and "materiality" under Rule 10b–5, we think it advisable first to set forth the well known and well understood common law definitions of these terms and the reasons for the rules in which the terms are incorporated. Insofar as is pertinent here, the test of "reliance" is whether "the misrepresentation is a substantial factor in determining the course of conduct which results in [the recipient's] loss." Restatement, Torts § 546 (1938); accord, Prosser, Torts 550 (2 ed. 1955); I Harper & James, Torts 583–84 (1956). The reason for this requirement, as explained by the authorities cited, is to certify that the conduct of the defendant actually caused the plaintiff's injury. The basic test of "materiality," on the other hand, is whether "a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question." Restatement, Torts § 538(2) (a); accord, Prosser, Torts 554–55; I Harper & James, Torts 565–66. Thus, to the requirement that the *individual plaintiff* must have acted upon the fact misrepresented, is added the parallel requirement that a *reasonable man* would also have acted upon the fact misrepresented.[3]

The parties to this suit apparently agree that the requirement that a misrepresentation be material is carried over into civil cases under Rule 10b–5 involving non-disclosure by an insider. Moreover, the meaning of the term is ostensibly the same as at common law. III Loss, Securities Regulation 1431. "Materiality" encompasses those facts "which in reasonable and objective contemplation might affect the value of the corporation's stock or securities * * *" Kohler v. Kohler Co., 319 F.2d 634, 642 (7 Cir. 1963).

Disagreement centers on the applicability and meaning of the requirement

---

3. Care must be taken to distinguish the requirement that a reasonable man would have *believed* the fact misrepresented. There is a marked present-day trend away from this common law requirement.

Prosser, Torts 552–54; I Harper & James, Torts 582–83. The requirement may not exist at all under Rule 10b–5. See III Loss, Securities Regulation 1438.

that reliance be placed upon the misrepresentation. Our examination of the authorities satisfies us that this requirement also is carried over into civil suits under Rule 10b–5. Reed v. Riddle Airlines, 266 F.2d 314, 319 (5 Cir. 1959); Kohler v. Kohler Co., 208 F.Supp. 808, 823 (E.D.Wis.1962), aff'd, 319 F.2d 634 (7 Cir. 1963); Mills v. Sarjem Corp., 133 F.Supp. 753, 767 (D.N.J.1955); Speed v. Transamerica Corp., 5 F.R.D. 56, 60 (D. Del.1945); accord, III Loss, Securities Regulation 1765–66. The dicta in Kardon v. National Gypsum Co., 83 F.Supp. 613, 614 (E.D.Pa.1947), are not necessarily to the contrary. Plaintiff also relies on the fact that in Speed v. Transamerica Corp., 99 F.Supp. 808, 833, the court allowed a class action by the defrauded sellers, from which fact he infers that no inquiry into the reasons why each seller transferred his stock is required by Rule 10b–5. However, a comparison of that decision with the opinion in an earlier phase of the same suit, Speed v. Transamerica Corp., 5 F.R.D. 56, 60, shows that a class action was allowed only because the court was convinced that all members of the class had relied on defendant's misrepresentation.

■ This interpretation of Rule 10b–5 is a reasonable one, for the aim of the rule in cases such as this is to qualify, as between insiders and outsiders, the doctrine of *caveat emptor*— not to establish a scheme of investors' insurance. Assuredly, to abandon the requirement of reliance would be to facilitate outsiders' proof of insiders' fraud, and to that extent the interpretation for which plaintiff contends might advance the purposes of Rule 10b–5. But this strikes us as an inadequate reason for reading out of the rule so basic an element of tort law as the principle of causation in fact. Plaintiff's citation of decisions by the Securities and Exchange Commission, and commentary thereon, does not persuade us otherwise. Cady, Roberts & Co., Sec. Ex. Act Rel. 6668, p. 9 (1961); III Loss, Securities Regulation 1438–39 n. 30. The aim of administrative proceedings under Rule 10b–5 is to deter misconduct by insiders, rather than to compensate their victims. That, because of the peculiar circumstances of the particular outsiders involved, no harm actually results from the misconduct is ordinarily irrelevant to this preventive purpose. But see III Loss, Securities Regulation 1764.

On the other hand, we do not agree with certain overtones in the opinion of the trial court concerning the meaning of "reliance" in a case of non-disclosure under Rule 10b–5. The opinion intimates that the plaintiff must prove he actively relied on the silence of the defendant, either because he consciously had in mind the negative of the fact concealed, or perhaps because he deliberately put his trust in the advice of the defendant. Such a requirement, however, would unduly dilute the obligation of insiders to inform outsiders of all material facts, regardless of the sophistication or naivete of the persons with whom they are dealing. Connelly v. Balkwill, 174 F.Supp. 49, 59 (N.D.Ohio 1959), aff'd, 279 F.2d 685 (6 Cir. 1960), must be read in light of the fact that the prime defendant in that case was not an insider.

The proper test is whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact. Speed v. Transamerica Corp., 99 F.Supp. 808, 829; Kardon v. National Gypsum Co., 73 F.Supp. 798, 800 (E.D.Pa.1947). To put the matter conversely, insiders "are not required to search out details that presumably would not influence the person's judgment with whom they are dealing." Kohler v. Kohler Co., supra, 319 F.2d at 642. This test preserves the common law parallel between "reliance" and "materiality," differing as it does from the definition of "materiality" under Rule 10b–5 solely by substituting the individual plaintiff for the reasonable man. Of course this test is not utterly dissimilar from the one hinted at by the trial court. That the outsider did not have in mind the negative of the fact undisclosed to him, or that he did not put his trust in the advice of the insider,

would tend to prove that he would not have been influenced by the undisclosed fact even if the insider had disclosed it to him.

■ The trial court concluded that plaintiff would have sold his stock even if he had known that defendant Lerner, an insider, was one of the buyers. The trial court based this result upon its findings that plaintiff is an experienced and successful investor in securities; that he actively solicited the sale to defendants; that he did not ask his broker whether any insiders were bidding for stock in the corporation; that his broker knew two directors were bidding but did not think it necessary to inform plaintiff of this; that the only restriction plaintiff placed on his broker related to price; and that his broker suggested that five points would be a nice profit, to which plaintiff agreed. From these facts, the trial court presumably inferred that plaintiff was so desirous of "the potential five point profit he would make" and so reliant on knowledge acquired through "his many dealings in the securities field" that the identity of the buyer would have been of little or no concern to him.

We cannot say that the finding of the trial court was clearly erroneous.[4] Cf. Kohler v. Kohler Co., supra, at 642, in which the court held:

> "Here, the company could fairly deal with a person who had had many years of intimate acquaintance with the affairs of the corporation, who was closely related to many principals of the corporation, who had extrinsic sources of sound business advice, and who himself was promoting a speedy sale, in a manner

that might not be fair if plaintiff had been a novice to stock transactions or the corporation's activities."

The trial court also concluded that adoption of the November 4, 1960 resolution, and the setting in which it occurred, were not material facts that should have been disclosed to plaintiff. This result was based in part on the undisputed facts that at the time the resolution was adopted the Fashion Park directors only had before them the statement of the union manager that he knew of some unidentified person who would be interested in buying Fashion Park; that by the time plaintiff sold his stock on November 17, 1960 nothing more had occurred except that the president of Fashion Park had learned the name of the potential purchaser; and that within two weeks after he bought plaintiff's stock defendant Lerner disposed of part or all of his interest in 3137 of his 4300 shares at an average profit of only about $1 per share. The trial court presumably inferred from these facts that the prospects for "a sale of Fashion Park" and for a sale at a price "profitable to shareholders," insofar as Lerner and the other defendants apprehended them to be at the time they purchased plaintiff's stock, were too remote to have influenced the conduct of a reasonable investor.

Here too, the finding of the trial court was not clearly erroneous.[5] Cf. James Blackstone Memorial Library Ass'n v. Gulf, Mobile & Ohio R. R. Co., 264 F.2d 445, 450 (7 Cir. 1959), cert. denied, 361 U.S. 815, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959), in which the court said:

> "[W]e are aware of no case which [furnishes support] for plaintiffs'

4. In view of this result, we express no opinion on the totally novel question of whether failure by an insider to disclose his identity can ever be a violation of Rule 10b–5. See generally III Loss, Securities Regulation 1463–65. We also find it unnecessary to decide whether, as defendants H. Hentz & Co. and William P. Green contend, knowledge of the fact that two directors were bidding for Fashion Park stock, known to plaintiff's broker, can be imputed to

plaintiff so as to bar plaintiff from recovery.

5. In view of this result, we express no opinion on the unsettled question of whether, as defendants H. Hentz & Co. and William P. Green argue, they cannot be held liable because they were found by the trial court to have had no actual knowledge of the November 4, 1960 resolution and the surrounding circumstances. See generally III Loss, Securities Regulation 1465–66.

contention that Gulf under the facts and circumstances of this case was under obligation to inform plaintiffs of its desire to sell the Harrison Street property or that it hoped to sell such property to the government."

Compare Strong v. Repide, supra; Speed v. Transamerica Corp., supra; Kardon v. National Gypsum Co., supra.

Affirmed.