**Neil ROGEN, Plaintiff,**

v.

**ILIKON CORPORATION, Josiah M. Scott, Quing Wong, Laszlo Bonis, Ole Sandven, and George Ansell, Defendants.**

**Civ. A. No. 62-732.**

United States District Court
D. Massachusetts.

Jan. 20, 1966.

Neil Leonard, Robert J. Hallisey, M. Gordon Ehrlich, Bingham, Dana & Gould, Boston, Mass., for plaintiff.

Robert W. Meserve, Nutter, McClennen & Fish, Boston, Mass., for defendants.

SWEENEY, District Judge.

This is an action under Section 10(b) of the Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b),[1] and Rule 10b–5, 17 C.F.R. Sec. 240.10b–5,[2] promulgated thereunder, to recover damages the plaintiff claims he sustained as a result of the defendants misrepresenting and concealing material facts in connection with the sale of stock by the plaintiff to the defendant corporation. The defendants have moved for summary judgment on five separate and independent grounds:

1. There was no relevant or material nondisclosure.

2. There was no reliance by plaintiff.

3. Plaintiff released any right to recover.

4. Plaintiff inflicted any damages on himself and is, therefore, barred from recovery.

5. Permitting recovery on the facts of this case would, as a practical matter, place an impossible burden on corporations purchasing stock from its stockholders.

From extensive depositions, affidavits and admissions, the following facts are not disputed.

Ilikon Corporation was formed in June 1960 by the plaintiff together with the defendants Bonis, Sandven and Wong for the purpose of undertaking research and development in the field of materials engineering and science, including a project of plaintiff's invention, called the "aluminum bubble" or "aluminum can" process. The plaintiff was the key insider in the promotion of Ilikon and became its president, secretary and a principal, if not the largest, stockholder.[3]

Late in 1961, the individual defendants and other Ilikon personnel became more and more dissatisfied with the plaintiff's performance in his official capacity; and at the directors' meeting on January 19, 1962, the directors dismissed plaintiff as president and secretary, terminated his employment agreement as of February 28, 1962 and elected the defendant Bonis to the presidency. No effort was made to remove the plaintiff or his father from the Board of Directors.

1. Section 10(b) provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. Rule 10b–5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

3. The complaint alleges that on March 26, 1962, the date of the agreement which gave rise to this suit, 350,000 shares of common stock were outstanding, of which plaintiff owned 52,700 shares, and plaintiff's father, Harry Rogen, 7,100 shares. 75,000 shares had been registered and sold to the public in March 1961; and the remainder were divided principally among the defendants Scott, Wong, Bonis and Sandven.

At the same meeting, the defendant Scott suggested that the plaintiff, to assist in obtaining additional needed financing for the corporation, sell to the corporation 30,000 of his shares for $30,000. Should the plaintiff accept this offer, the corporation would be willing to cooperate in a registration of all remaining stock of Mr. Rogen. The plaintiff rejected the offer, and the corporation did likewise with his counter-proposal. The plaintiff promptly retained counsel and, on February 20, 1962, obtained a "no action" letter from the Security and Exchange Commission. When, thereafter, Ilikon refused to buy the stock at $8.00 per share, the plaintiff began selling in the open market. The price of the stock, which on January 23 had been $11.00, fell to $6.00 by March 5. At a directors' meeting on March 2, which the plaintiff failed to attend,[4] the directors voted to negotiate with plaintiff concerning the liquidation of his holdings and to order the transfer agent to stop the transfer of Ilikon stock owned by plaintiff and his father.

Between March 14 and March 26, 1962, Scott and Wong, with the eventual approval of the other defendants, concluded an agreement with the plaintiff, and, after elaborate consultation with counsel, the agreement dated March 26, 1962 was signed. It provided, in essence, for the purchase by Ilikon of 55,200 shares owned by plaintiff and his father for $300,000; and it included a requirement for an orderly liquidation of the remaining shares owned by plaintiff and his father, a release by the plaintiff and his father of any claims arising out of this sale of stock, and an acknowledgment by the plaintiff and his father that they are fully familiar with the business and prospects of the corporation and are not relying on any representations with respect thereto. The contract was not consummated until August 27, but for purposes of this motion I consider the critical date to be March 26, 1962.

The "aluminum bubble process" evolved from the plaintiff's idea of producing aluminum containers by blowing gas under pressure through a nozzle submerged in molten aluminum to create aluminum bubbles. After the formation of Ilikon, direct research on the process was conducted, under the supervision of plaintiff, by the defendants Bonis and Witt; and the first aluminum can was blown in June 1961. But since then, research and development has continued as a slow, gradual process of refinements and improvements. The process is not yet in commercial production.

On October 25, 1961, the plaintiff wrote to Reynolds Metals Company describing the process and inviting negotiations. In his letter he stated: "We have successfully demonstrated that our principle of aluminum can fabrication is entirely feasible. It is now time to consider bringing this process out of the laboratory into the commercial field. * * *" Reynolds' reply of November 9, including a "Suggestion Submission Agreement," remained unanswered until after plaintiff's dismissal when the defendant Bonis, on January 24, reopened the correspondence with Reynolds. Numerous conferences were held and discussions had about the type of agreement Ilikon wished to enter with Reynolds; but the negotiations proceeded slowly and unsatisfactorily, and on July 11, 1962, Reynolds terminated them.

Plaintiff was not informed about the negotiations, and he stated that he did not learn about them before signing the March 26 contract. Further, he claims that had he known of the negotiations he would not have agreed to sell his stock at the contract price.

This failure of the defendants to apprise plaintiff of the Reynolds' negotiations as well as their failure to disclose certain alleged important breakthroughs in research, together with alleged misrepresentations by the defendants Scott and Wong concerning the state of the market for Ilikon stock, and

---

4. On March 2, 1961, plaintiff tendered his resignation as a director, which the Board refused to accept. On March 5, the plaintiff confirmed his tender by letter.

"other facts which discovery and trial may disclose," form the basis of plaintiff's suit.

Opposing the defendants' motion for summary judgment, the plaintiff asserts that genuine issues of fact do exist and that, accordingly, the motion must be denied. However, resolving all factual doubts against defendants and permitting all inferences favorable to plaintiff, I have concluded that the defendants are entitled to judgment as a matter of law, on the basis of their arguments that there was no relevant or material nondisclosure and that there was no reliance by plaintiff.

The parties are, apparently, agreed that Rule 10b–5 is violated by nondisclosure, as well as misrepresentation, of material facts.[5] Since there is a duty to disclose material facts and since there is no question, at least for purposes of this motion, that the Reynolds' reopened negotiations had not been disclosed to plaintiff before he signed the agreement, the question remains whether this is a material fact.

■ The basic test of materiality is whether "a reasonable man would attach importance [to the fact not disclosed] in determining his choice of action in the transaction in question," Restatement, Torts § 538(2) (a), and this same meaning applies in 10b–5 situations. List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965); Kohler v. Kohler Co., 319 F.2d 634 (7th Cir. 1963); III Loss, Securities Regulation 1431 (2d Ed. 1961).

At least two cases have held that the desire, or plans, or even resolutions to sell corporate assets are, until a final decision has been made, too remote to have influenced the conduct of a reasonable investor and, hence, need not be disclosed. Compare List v. Fashion Park, supra, and James Blackstone Memorial Library Assn. v. Gulf, Mobile and Ohio R.R. Co., 264 F.2d 445 (7th

Cir. 1959) with Kardon v. National Gypsum Co., 73 F.Supp. 798 (E.D.Pa. 1947).

■ Corporate dealings and negotiations cannot, in most instances, be carried on, much less consummated in public; and until a transaction has been completed, there cannot, as a practical matter, be a duty on the participants to divulge either the details or even the fact of the discussions.

■ The negotiations were in a very preliminary stage up to the date of the stock sale agreement and they were, in fact, permanently broken off less than two months later. It is not at all unlikely that rumors of the discussions between Ilikon and Reynolds did, indeed, affect the price of the stock but that is not controlling. I can take judicial notice of the fact that the stock market not infrequently reacts even to entirely unfounded rumors. Accordingly, I rule, as a matter of law, that the Reynolds' negotiations were not material and there was no duty to dislose them to the plaintiff.

In his complaint plaintiff alleges that among the matters concealed from him were "important break-throughs in research * * * which materially enhanced the commercial feasibility of the aluminum bubble process." He claims that "secret technological advances were made in the laboratory which brought this process to a point where it could revolutionize a segment of the aluminum industry; for example, the method was being successfully used in the production of aluminum cans and containers." He now points to essentially two developments to support these allegations—use of a machine to produce cans and a new gas composition.

Two undisputed facts must be remembered in connection with this portion of plaintiff's complaint—1) the business of Ilikon was research, particularly on

---

5. The parties have not, in this part of their argument, distinguished between subsections (a), (b) and (c) of the Rule; and while suits involving total nondisclosure probably would not lie under either sub-section (a) or (b), the outcome does not hinge on a choice as the requirement of materiality is equally applicable to subsection (c). List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965).

 

the aluminum bubble process, and 2) until January 19, 1962 the plaintiff was the chief officer of the corporation, received periodic progress report and had the run of the corporation's small plant. Plaintiff does not moreover, dispute defendants' assertion that the process is not commercially useful even today.

There is nothing in this record beyond the plaintiff's bare assertions that the use of the machine and new gas composition were significant break-throughs, to show that, in fact, they were anything more than the small advances toward reduction to commercial use of the idea that one would expect, or that they were "facts about a corporation's business which in reasonable and objective contemplation might affect the value of the corporation's stock or securities and which the insiders should reasonably believe are unknown to the outsider." Kohler v. Kohler, supra, 319 F.2d at 642.

 The plaintiff, in addition, admittedly knew that work was being done on an automatic machine and on the composition of the blowing gas, and he acknowledged in the stock sale agreement that he was "fully familiar with the business and prospects of Ilikon." Reliance is a necessary element of plaintiff's case, and it is a subjective one. List v. Fashion Park, supra; Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965). Just as the insider presumably must exercise due diligence to acquaint himself with facts concerning his company's business, see III, Loss, op. cit. supra at 1465, one in the position of this plaintiff, who was, after all, a director up to within a month of the signing of the contract in suit, must also exercise some diligence to discover the facts. This plaintiff not only failed to make any inquiry concerning the work which he knew was being done but, in any event, admitted a total lack of reliance on any obligation to make disclosure.

 There remains the matter of the alleged misrepresentations concerning the state of the market. Since they were clearly only expressions of opinion and admittedly so regarded by the plaintiff who admittedly did not rely upon them, they cannot support a cause of action under Rule 10b–5. Nor can the general allegations concerning "other facts which discovery and trial may disclose" entitle plaintiff to a denial of the motion for summary judgment. If such "other facts" exist, it was incumbent upon plaintiff to show the court what they are and that they are genuine issues of material fact to be tried. Surkin v. Charteris, 197 F.2d 77 (5th Cir. 1952); 6 Moore's Federal Practice 2129 (2d Ed. 1953).

The motion for summary judgment is, accordingly, allowed. Judgment may be entered for the defendants.