**Knute SWANSON, on behalf of Peoria Service Company, and on behalf of all shareholders of Peoria Service Company similarly situated, Plaintiff,**

**v.**

**AMERICAN CONSUMER INDUSTRIES, INC. et al., Defendants.**

**Civ. A. No. P–2891.**

United States District Court,
S. D. Illinois, N. D.
July 7, 1971.

Richard Orlikoff and Arthur T. Susman, Chicago, Ill., Thomas V. Cassidy, Peoria, Ill., for plaintiff.

Frank O. Wetmore, II, and Frank B. Gilmer, Chicago, Ill., Eugene L. White, Peoria, Ill., for defendants.

## DECISION AND ORDER

ROBERT D. MORGAN, District Judge.

Plaintiff, a shareholder of defendant, Peoria Service Company, filed this suit on behalf of Peoria and all Peoria shareholders who are similarly situated, praying injunctive and other relief based upon allegations that violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and fraud affected a plan of corporate reorganization which led to the sale of Peoria's assets to the defendant, American Consumer Industries, Inc. (hereinafter ACI), and the dissolution of Peoria.

The case was established as a class action under Rule 23, Federal Rules of Civil Procedure, through Notice proceedings leading to order of this court, dated April 7, 1970, through which it was decided that the notice was sufficient to bind those of the class who did not elect to be excluded. Thirty-one persons, holding over 73,000 of 81,594 shares outstanding, did formally elect to be excluded. This court hereby readopts the findings and conclusions stated in that prior order.

Prefatorily, the format of litigation arises from facts which are stipulated as follows. In and prior to March, 1965, ACI owned 90% of the outstanding shares of the defendant, United States Cold Storage Corporation (hereinafter USC). USC owned slightly more than 86% of the outstanding shares of Peoria. As a result of that dominant ownership, at all material times, ACI elected all of the board of directors of USC and USC elected all of the board of directors of Peoria. At all material times, Peoria's board of directors was comprised wholly of persons who were officers or directors, or both, of ACI.

About March 11, 1965, Peoria and ACI entered into an agreement and plan of reorganization for Peoria, which provided, in pertinent part, for the sale of Peoria's assets to ACI, the consideration to be paid in ACI stock, followed by the dissolution of Peoria and distribution of the ACI shares as a liquidation dividend on dissolution to Peoria's shareholders. That plan was approved by Peoria's shareholders at a special meeting held March 31, 1965. Peoria's assets were transferred to ACI as of April 1, 1965. Peoria was dissolved August 23, 1965.

The gravamen of the complaint, as it relates to the charge of fraud, is that

ACI and USC, through their common officials, breached their fiduciary duty to Peoria and its minority shareholders to the injury of both.

The charge of defendants' violation of Section 10(b) rests upon allegations that proxy information submitted to Peoria's shareholders with the notice of the special meeting was deceptive in that it failed to disclose material information and thus caused damage to that corporation and its minority shareholders.

In summary, that information, contained in a letter from Joseph S. Robinson, as Peoria's president, stated that the Peoria board of directors recommended approval of the reorganization plan for the stated reasons that ACI shares were readily marketable securities compared with the "relative marketless nature" of Peoria's shares; that ACI had paid dividends annually for 20 consecutive years, compared with Peoria's inability to pay dividends; and that the plan would give Peoria's shareholders an interest in a diversified industry not dependent upon local conditions. The letter also advised the Peoria shareholders that USC owned about 87% of Peoria's outstanding shares and that USC had indicated that it would vote its shares in favor of the plan of reorganization and in favor of the dissolution of Peoria. That letter further advised the Peoria shareholders that USC was a subsidiary of ACI, but it did not expressly advise them that Peoria, ACI and USC had interlocking boards of directors or some other factual matter noted below.

Summary judgment was entered for the defendants in this court on August 20, 1968. Swanson v. American Consumer Industries, Inc., 288 F.Supp. 60 (S.D.Ill.1968). That judgment was reversed and the cause was remanded to this court for trial. Swanson v. American Consumer Industries, Inc., 415 F.2d 1326 (7 Cir. 1969). The Court of Appeals held "that these proxy statements were misleading in material respects and were deceptive as a matter of law." 415 F.2d at 1331. Deception was noted in failure of the letter to disclose that all of Peoria's directors were ACI officers and directors, in failure to state the valuation of Peoria's assets with justification, and in failure to disclose ACI's intention to dispose of Peoria's physical plant and to construct new facilities to serve the Peoria, Illinois, area, which Peoria theretofore had served.[1] 415 F.2d at 1330–1331.

The cause was remanded for trial of factual issues to determine whether there is a causal relationship between that deceptive material and the Peoria-ACI transaction, and whether by such deception or any fraud Peoria or its minority shareholders, or both, were injured. 415 F.2d at 1332.

After a trial, as well as additional briefing and proposed findings and conclusions by the parties, the court, on the basis of the evidence and stipulations in the record before it, makes the following:

## FINDINGS OF FACT

1. Any facts stated above which may not be fully covered below.

2. Plaintiff, an Illinois resident, has been a shareholder of Peoria since at least 1956, and on March 31, 1965 he was the owner of 2,703 shares of Peoria common stock.

3. ACI is a New Jersey corporation with its principal offices in New York, New York. It is primarily a holding company, engaged, both directly and through its subsidiaries, in the marketing of diversified consumer commodities and services. At all material times, ACI has engaged, directly or through subsidiaries, in the business of cold storage warehousing and in the manufacture and sale of ice.

4. At all material times, ACI's shares were listed and traded on the New York Stock Exchange.

---

[1]. The Court of Appeals' opinion also stated that it was not disclosed that ACI was USC's parent. That conclusion is counter to the face of the letter which states that USC is a subsidiary of ACI.

5. USC is a Delaware corporation, with its principal place of business in New York City. It is a subsidiary of ACI, and ACI owns 90% of its outstanding capital stock. On and prior to March 31, 1965, USC was engaged primarily in the operation of a number of cold storage warehouses in various cities other than Peoria, Illinois. Since September, 1966, it has also operated a cold storage warehouse at East Peoria, Illinois.

6. Prior to its dissolution, Peoria was an Illinois corporation, which had for many years engaged in the manufacture and sale of ice and the operation of cold storage warehouses in Peoria, Illinois, operating from two warehouses, hereinafter referred to as plant number one and plant number two. Plant number one, consisting of cold storage and garage facilities, was located on Washington Street in Peoria. Plant number two, comprised of warehouse facilities, embraced two parcels of real estate on Adams Street in Peoria.

7. As of March 31, 1965, Peoria had 81,594 shares of its common stock outstanding; its shares were traded in the over-the-counter market; and on that date USC was the owner of 70,539 of Peoria's shares, or slightly in excess of 86% of its total shares outstanding.

8. In the Spring of 1961, ACI had been approached by a broker who offered about 80% of Peoria's outstanding shares for sale. That contact culminated in a contract between ACI and Peoria's controlling shareholder for the transfer to ACI of 69,206 shares of Peoria stock in exchange for ACI shares at an exchange ratio of nine shares of Peoria for one share of ACI. That exchange attributed a value of about $2.75 per share for the Peoria stock, based upon the then price range of ACI on the Stock Exchange. The agreement also provided that ACI would tender an offer to other Peoria shareholders for the purchase of their stock at a price of $3.00 per share. Additional shares were acquired by ACI as a result of that tender offer.

9. In 1962, ACI sold its Peoria shares to USC, at ACI's cost thereof. USC increased its Peoria holdings from time to time until it owned about 86% of Peoria in March, 1965.

10. At all material times, Joseph S. Robinson was the chief executive officer of ACI, USC and Peoria.

11. By the early 1960's Peoria's cold storage plants were antiquated and not adaptable to modern warehousing practices. They were multi-story buildings of limited capacity. Truck docking space was inadequate, doors were too small to permit the use of lift trucks, and operation was largely a matter of hand labor. Walls and floors had cracked in some areas, roofs and insulation were in poor condition, and the elevators upon which a multi-story operation depended frequently broke down. Except for some automated equipment in its plant number one, its refrigeration equipment was obsolete, requiring constant engineering attention to keep it operating. Its operations were hampered by cumbersome and costly labor union contracts. It employed 32 persons in 1961, a number reduced to 25 employees by early 1965.

12. By 1960 Peoria had not paid any dividends in recent years. Its prior operations were marginal, in some years resulting in net losses. Its operational position was affected by its over-reliance for profit on the ice manufacturing business.

13. ACI's management was aware of the existing marginal situation when ACI acquired a controlling interest in Peoria. Robinson was then of the opinion that successful operation of Peoria would require substantial remodelling or replacement of its obsolete facilities. For that reason, he required, as a condition to the control acquisition agreement, that Peoria exercise an option which it then held to purchase the Wilton Mortuary property, situated adjacent to Peoria's Adams Street plant, and the Wilton property was purchased by Peoria at a cost of $48,000.

14. Immediately after its acquisition of control of Peoria, ACI transferred Sidney McCausland to Peoria as its vice president and general manager. McCausland then had twenty years' experience in the cold storage business. Just prior to his transfer to Peoria, he had been the manager of USC's cold storage plant at Stockton, California.

15. Upon assuming the management function at Peoria in 1961, McCausland undertook to change the business emphasis from ice manufacturing to cold storage warehousing. He sought and acquired additional storage business from national accounts, and he determined that there was more storage business potential in the area than Peoria's facilities could accommodate.

16. Peoria's operating costs were excessive due to the obsolescence of its facilities, the difficulty of keeping its equipment operable, and the labor costs. Though there was no cold storage competition in Peoria, McCausland encountered competition in national frozen food accounts from other areas, principally from Chicago. Price competition prevented increased charges to customers to offset increases in already excessive costs. During his first year at Peoria, McCausland concluded that profitable operation of the business would be impossible under circumstances then existing.

17. By 1962 it was determined to be not feasible to convert the Wilton property for cold storage use, and engineering surveys indicated that it was not feasible to expand existing facilities by use of the Wilton land. The Wilton property was then listed with real estate brokers for sale.

18. Complete reports of operations were submitted by McCausland to Robinson, as president of Peoria. Upon the basis of such reports, Robinson made the determination that successful operation of the business would require the acquisition of a new plant, requiring an investment of about $1,000,000. He instructed McCausland, in 1962, to seek financing for a new plant to be constructed by Peoria.

19. Between 1962 and 1964, McCausland contacted a number of financial institutions in Peoria and elsewhere as potential sources of financing. Robinson also contacted several finance brokers and a major insurance company, seeking financing on Peoria's behalf. Each request was denied for the reason that Peoria was not financially capable of supporting the necessary loan. Both McCausland and Robinson were advised in certain instances that financing would be extended to Peoria if ACI or USC would guarantee the loan, but neither ACI nor USC was willing to do so.

20. During this period, McCausland also contacted several local people, proposing that they erect a warehouse facility for lease to Peoria. Some declined because of the amount of the necessary investment, others because the financing would not be guaranteed by either of the parent companies.

21. In late 1964, Robinson was contacted by Seckel-Blanchard Company with a proposal that the latter convert a dry-storage warehouse which it owned to a cold storage facility for lease to Peoria. Though such conversion was found to be feasible, Seckel-Blanchard would not make the necessary investment without a parent guarantee of Peoria's credit.

22. Also, in late 1964, a local real estate developer contacted Robinson with a proposal that he construct facilities for lease to Peoria, but only on the condition that ACI would guarantee the transaction. A guarantee was refused. As a result of that contact, a contract owned by that party for the purchase of a tract of land near East Peoria, Illinois, was assigned to ACI for a consideration of $5,548.60, which was paid by Peoria.

23. Robinson testified that ACI had a general policy to require that its operating subsidiaries stand on their own feet, and that parent guarantees of credit for subsidiaries were extended only in exceptional situations in which the ACI

directors determined that, for business reasons, it was important to ACI that such a guarantee be extended. The evidence does not refute that testimony, nor does it support a contention that refusal to extend a guarantee for Peoria was a departure from ACI's general policy.

24.. By late 1964 the management of ACI had concluded that the only way to salvage Peoria from financial disaster was either a merger with ACI or a tax-free reorganization. Robinson then instructed McCausland to begin exploratory conversations to determine the prospects for sale of Peoria's real estate and the amount of cash reasonably to be expected from a cash sale thereof. The Wilton property had been offered for sale for $50,000, since 1962, without success. McCausland was advised by a real estate dealer that he might expect to receive about $50,000 for the plant number one property and about $100,000 for each of the two parcels of real estate comprising plant number two.

25. McCausland contacted neighboring businesses to determine their interest in the purchase of the several parcels of real estate. Those contacts led to offers and sales of the several parcels were eventually made by ACI after the purchase of Peoria's assets. McCausland's testimony is not refuted that he contacted numerous potential buyers but that none but the eventual purchasers were interested.

26. McCausland never offered the properties for sale as a unit, but each offer related to the individual parcels. That approach was governed by two reasons. First, he was of the opinion that if ACI, with its broad background in the cold storage business, could not achieve a profit basis with Peoria, he would never find a buyer interested in the package. Secondly, he was certain that a buyer of the unit, if one could be found, would insist on a non-competition agreement as a condition of the purchase. Any such agreement would have run counter to planning designed to keep Peoria in the storage business at some

new location in the Peoria area. All efforts by McCausland directed to the sale of the properties were reported to Robinson and pursued under Robinson's direction.

27. All of McCausland's efforts to obtain a new plant were pursued on behalf of Peoria as an entity. He approached sources of potential financial aid as an executive of that company only. He advised them of the market prospects for Peoria and, also, of its problems and urgent need for new facilities. As he put it, he was unable to get financing, but he did receive "a great deal of sympathy." The evidence is consistent only with a finding that a good-faith effort was made to obtain a new facility for Peoria as an entity.

28. During the three full years of operation of Peoria under management secured by ACI (McCausland), independent audits of Peoria's balance sheets and statements of earnings revealed operating results as follows: for 1962, a loss of $639; and for 1963 and 1964, profits of $15,430 and $13,391, respectively. The operating results were based upon sales records, reduced by expenses as shown on Peoria's books. Expenses for extra executive, engineering, sales promotion, advertising, auditing and legal services which were provided by ACI and USC during those years were not charged as expenses on Peoria's books. Robinson estimated that the reasonable value of such services rendered for, but not charged to, Peoria was at least $20,000 per year. McCausland estimated the reasonable value thereof at about 10% of gross sales, or about $30,000 per year. Thus, it must be inferred that, as an entity, Peoria actually operated at a loss during each of those years.

29. Beginning in late 1964, officers of ACI had a number of discussions with their attorneys and independent accountants, centered around the situation with respect to the condition of Peoria's facilities, its inability to obtain financing and its operating performance record. Such discussions led to the conclusion that a plan of reorganization for Peoria

was necessary, with ACI itself undertaking to develop the East Peoria property as a storage facility.

30. About March 11, 1965, pursuant to formal authorization by their respective boards of directors, ACI and Peoria entered into an agreement and plan of reorganization, the salient provisions of which were: that, following approval of the plan by Peoria's shareholders, Peoria's assets would be transferred to ACI in exchange for the issuance to Peoria of 16,319 shares of the capital stock of ACI, after which Peoria would be dissolved and the ACI shares would be distributed to its shareholders as a liquidating dividend on dissolution on a ratio of one share of ACI for each five shares of Peoria surrendered. Based on the market value of ACI shares, that plan represented a value of the Peoria assets at $285,000 to $290,000.

31. On March 15, 1965, a notice of a special shareholders meeting was mailed to all Peoria shareholders, together with a copy of the agreement for reorganization and a letter from Robinson, as Peoria's president. Among other things heretofore mentioned, the letter advised the shareholders that a special meeting would be held on March 31, 1965 for the purposes of "considering adoption of an Agreement and Plan of Reorganization between the Company" and ACI, and "considering liquidating and dissolving the Company." At that meeting 71,322 shares, including the 70,539 shares owned by USC, were voted for both the plan of reorganization and for dissolution of Peoria. Plaintiff orally voted his 2,703 shares against both propositions, but he abstained from voting 1,508 shares for which he held proxies.

32. Peoria's assets were transferred to ACI, effective April 1, 1965.[2] From that time until September, 1966, ACI operated Peoria's plants as a division of ACI.

33. Pursuant to the reorganization plan, 61 shareholders, including USC, exchanged 74,285 Peoria shares for ACI shares. Forty shareholders, including plaintiff, and representing about 7% of the outstanding shares of Peoria, failed to effect the exchange after notice of their right to do so. Fifty-one shareholders, representing 1.9% of such shares, had not provided Peoria with proper mailing addresses and apparently did not receive notice of their right of exchange.

34. No formal appraisal of Peoria's assets was obtained prior to the adoption of the plan of reorganization or prior to the special meeting of shareholders on March 31, 1965. Robinson and other executive officers had had substantial experience in the buying and selling of cold storage facilities and they were intimately familiar with Peoria's properties. The total exchange evaluation of about $285,000 was based on the anticipated liquidation value of those assets. The exchange ratio adopted was based upon that total evaluation of Peoria assets and the market value of ACI's stock of $17.75 per share on March 11, 1965. The exchange ratio of five to one placed an evaluation of Peoria stock at about $3.55 per share on the basis of the March 11 value of ACI.[3]

35. Plaintiff was out of Illinois when the notice of special meeting was delivered to his residence. His first knowledge of the proposal came to him by a telephone conversation with Chapin Wright, another Peoria shareholder. Without seeing the proxy materials, and without specific knowledge of their total content, plaintiff decided during the course of that conversation to seek legal advice because he thought the five-to-one ratio "stinks." His objection was based upon his opinion that there was a market for Peoria shares and a market value of about $5.00 per share. He did not con-

2. All assets were transferred except the corporate franchise, Peoria's minute books, and $15,000 to defray the cost of reorganization.

3. The market value of ACI on March 31, 1965 was $20.25. If measured by that figure, the price paid for Peoria's assets exceeds $330,000, or over $4.00 per Peoria share.

sider employing the right of appraisement provided to minority shareholders by the Illinois Business Corporation Act. Ill.Rev.Stat.1969, c. 32, § 157.73. He testified that he deemed that procedure too expensive. His objection to the plan at the special meeting of Peoria shareholders was based on the ratio of exchange.

36. On March 26, 1965, plaintiff's attorney phoned Robinson and demanded $10,000 as a settlement for plaintiff and Wright to avoid litigation. On March 29, 1965, the attorney again called Robinson and accused him of "jiggling" ACI stock on the Exchange to create an artificial value. He again demanded a settlement. Both demands were refused. There was no suggestion in either conversation that the proxy materials were deemed to be inadequate or in any way deceptive. On the latter date, plaintiff filed a suit in a state court to enjoin the meeting and consummation of the plan. A temporary injunction was denied and that suit was dismissed subsequent to the filing of the complaint herein.

37. The evidence related to determination of a market value for Peoria shares in early 1965 is nil. Stock transfer records of Peoria show that there were some isolated sales of nominal amounts of Peoria stock in 1963 and 1964. Most such sales were to plaintiff, Chapin Wright, or to a brokerage firm for which Wright worked. There is no evidence of any sale after October, 1964. The "National Monthly Stock Summary" for March, 1965 did indicate bids for Peoria stock ranging from 4½ to 5⅜. It is impossible to tell from that publication the date when the bid was first listed, how many shares were offered or wanted, or what transactions, if any, had actually taken place. Brokers who listed the bids could not be held to the price advertised, and the publisher expressly disclaims responsibility for the accuracy of its listings. The publication is designed to apprise brokers of the identity of others who have expressed an interest in a particular stock. It simply cannot fairly be construed as reflecting a market value for any stock. The evidence is wholly insufficient to support the contention that there was a market for Peoria's shares, or to support the position that defendants should have taken into account "a share market" in their evaluation of Peoria's assets or shares.

38. Between April 5, 1965 and September 20, 1965, ACI entered into contracts for the sale of the real estate obtained from Peoria, with each contract containing a provision that ACI would retain possession until September 15, 1966. The realty comprising plant number one was sold for $40,000. The two parcels comprising plant number two were sold for $85,000 and $80,000, respectively. The Wilton property was sold for $33,500. The net consideration to ACI, after deducting sales expenses, was $237,249.40. All sales were negotiated by Robinson, following up earlier contacts made by McCausland.

39. ACI purchased the East Peoria real estate in 1965 and constructed a cold storage warehouse thereon at a cost of $1,318,581, including the cost of the land. Construction was completed in September, 1966. USC took possession of the facility under a lease from ACI and began the operation thereon of a cold storage warehouse under the name and style of United States Cold Storage Company of East Peoria. At the same time ACI discontinued operation of the Peoria facilities. On June 30, 1967, USC purchased the East Peoria premises from ACI at its then appraised value of $1,-586,405.

40. Because of its obsolescence and the prohibitive cost of its removal and reinstallation, the refrigeration equipment in Peoria's plant number two had no value. The same was true of the equipment in its plant number one, with the exception of certain automated compressors and refrigeration units which had been installed therein in the mid-1950's. The latter equipment was carried on Peoria's books in 1965 at a value of $14,854.60. The only testimony related to its actual value in 1965 was McCausland's testimony that that equipment had a sales value of about $3,000, if a purchaser could be found who was

willing to remove it and reinstall it elsewhere. ACI retained possession of this automated equipment which it removed for installation elsewhere. With that exception, all refrigeration equipment was abandoned by ACI as valueless when it ceased operation of the Peoria facilities in September, 1966. It remained in the buildings when the real estate was sold. Other office, plant and mobile equipment was sold by ACI.

41. All sales of real estate, equipment and fixtures by ACI were arm's-length transactions based upon the judgment of its officers that the fair market value thereof was offered and received.

42. As of March 31, 1965, Peoria's balance sheet showed a book net worth of its assets of $478,169.59. The assets were transferred to ACI's books at a value of $290,267.70, representing the aggregate of the March 11th value of the shares exchanged and the costs of transfer taxes in the exchange. The buildings and machinery were written down $172,-901.89 (the difference less the $15,000 Peoria retained), apportioned as between the various assets in the proportion that the book value of each asset on Peoria's books bore to the total book value on such books of all assets in the same category. The procedure employed was approved by defendants' independent accountants.

43. The value of the consideration paid by ACI for Peoria's assets was the substantial equivalent of the value received by ACI. ACI obtained from Peoria the following assets and values:

| | |
|---|---|
| Cash | $ 72,598.25 |
| Net Receivables (less reserve for bad debts) | 19,882.00 |
| Inventories | 2,847.65 |
| Equipment retained by ACI | 3,000.00 |
| Net value of real estate (less expenses of sale) | 237,249.40 |
| Credit for consideration paid on East Peoria land | 5,548.60 |
| Furnishings, tools and miscellaneous | 2,131.50 |
| Vending machines, trucks and other equipment sold | 13,500.00 |
| Value of assets received by ACI | $ 356,757.40 |
| Less: Liabilities assumed by ACI | 49,349.43 |
| Net value of assets received | $ 307,407.97 |

44. There was a good faith effort by the directors of Peoria and the officers and directors of ACI to accurately evaluate the assets of Peoria for purposes of reorganization. The substantial equivalency of the $307,407.97 value received to the value of $290,267.70, fixed at the time of reorganization, refutes the contention that any party acted dishonestly or in bad faith, and the further contention that the reorganization plan was a scheme by ACI to raid Peoria. Peoria's expenses of the reorganization and dissolution exceeded the $15,000 retained to pay same. The minor difference was paid by ACI, and the $15,-000 is not included in any way in the foregoing computations.

45. The testimony of plaintiff's expert witness as to evaluation of Peoria's assets and Peoria as a going business is based upon hypotheses which are not supported by the credible evidence before the court. At least the following bases for conclusions drawn by that witness are refuted by the weight of the evidence:

(a) The witness had never seen Peoria's equipment and was not familiar with it. Yet he adopted the book value of equipment as carried on Peoria's books as the fair market value thereof. That conclusion is directly refuted by the evidence that the equipment possessed only nominal value.

(b) He attributed substantial value to Peoria's position as a going concern, when, in fact, the weight of the evidence requires the finding that Peoria was a losing venture, doubtless destined for financial disaster had it continued operating as an entity under the circumstances existing which it was powerless to remedy.

(c) He considered the fact of the availability of management personnel for continued operation of the business as an element of value to the going concern. Yet it is undisputed that ACI found it necessary to supply management personnel immediately upon its purchase of a controlling interest in Peoria and

to continually supplement it without charge to Peoria for much of such supplementation.

(d) This witness had never seen Peoria's real estate, except that he had viewed the exteriors of the buildings a few days before he testified.

His opinion evidence is not credited.

46. In the area of business evaluation, McCausland's testimony is credited as reflecting the true financial future of Peoria and the only credible evidence related to the actual value of equipment. The court has taken into account his long experience in the field of cold storage warehousing, as well as the fact that he had no apparent interest in the cause at the time of his testimony at the trial. He had not been employed by ACI since January, 1966. At that time he was employed as vice president in charge of operations by Southeastern Public Service Company, a competitor of ACI in the general field of cold storage warehousing. At the time of trial herein, he had supervisory control over twenty-four Southeastern cold storage plants located in areas west of the Mississippi River.

47. The weight of the evidence before the court is consistent only with the finding that Peoria, during and prior to ACI control, was not a viable entity; that Peoria was unable, financially, to exploit the market available to it and unable to obtain such financing as was necessary for conversion of the corporation into a viable entity. Because of its financial condition, Peoria was incapable of embracing the corporate opportunity to exploit the cold storage market which, under different circumstances, could have been available to it.

48. There was no causal relationship between any deceptive failure of disclosure in the proxy material and the approval by the Peoria shareholders of the plan of reorganization and of the dissolution of Peoria.

49. There is no evidence to indicate that any shareholder relied upon any deception in the proxy material or that any shareholder was misled thereby.

Both plaintiff and Chapin Wright had knowledge that ACI, USC and Peoria had interlocking directorates, that ACI owned 90% of USC, and that Peoria was in poor financial condition because of the obsolescence of its equipment and its inability to obtain financing. Plaintiff had discussed these circumstances on several occasions with McCausland. A number of Peoria's minority shareholders reside in the vicinities of Peoria and Chicago. None, except plaintiff and Wright, were called by plaintiff as witnesses.

50. Plaintiff has not sustained the burden of proving the allegations of his complaint or the essential elements of his alleged cause of action, as follows:

(a) He adduced no evidence that any shareholder of Peoria was misled by, or relied upon, the proxy material which accompanied the notice of special meeting.

(b) He produced no evidence that the plans of reorganization of Peoria and of its dissolution were the result of any conspiracy or concert of action between ACI and USC as alleged.

(c) He produced no evidence that ACI and USC embarked upon a plan to build a large cold storage warehouse facility with a purpose and design to deprive Peoria and its shareholders of any corporate opportunity to own and operate such a facility.

(d) He has failed to prove that inadequate consideration was paid for Peoria's assets or that the assets of Peoria were misappropriated by defendants, or any of them.

(e) He adduced no evidence that the defendants, or any of them, knowingly employed any scheme, artifice or deceptive practice designed to injure Peoria or its shareholders.

(f) He offered no evidence that there was any waste or spoliation of Peoria's assets.

(g) He adduced no credible evidence of any injury to Peoria or any of its shareholders by the transaction complained of.

■ 51. With reference to the fraud allegations of the complaint, defendants have sustained their burden of proving that the transaction was a good faith and entirely fair effort by defendants and their officers and directors to relieve all the shareholders of Peoria from the consequences of its impending failure and to enable all such shareholders to participate equitably and ratably in the exploitation of the cold storage market available in the area. Defendants have further sustained their burden of proving that ACI paid the fair market value for Peoria's assets.

52. Any of the following Conclusions of Law which might more properly be considered Findings of Fact.

## CONCLUSIONS OF LAW

1. Any of the foregoing Findings of Fact which might more properly be considered Conclusions of Law.

2. The court has jurisdiction of the parties and the subject matter of this cause.

■ 3. Plaintiff has the burden of proving his right to redress for any violation of Section 10(b) of the Act, 15 U.S.C. 78j(b).

4. The proxy statement was deceptive as a matter of law, as the Court of Appeals has held in its prior decision herein, but to sustain his burden of proof under Section 10(b), plaintiff must also prove

(a) a causal relationship between the deceptive material and the sale, or that there was reliance upon the deceptive material. Janigan v. Taylor, 344 F.2d 781, 785–786 (1st Cir. 1965), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L. Ed.2d 120 (1965); List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965); Ruszkowski v. Hugh Johnson & Co., 302 F.Supp. 1371, 1374 (W.D.N.Y.1969); and

(b) that the corporation and/or its shareholders were injured as a proximate result of the material. Globus v. Law Research Service, Inc., 418 F.2d 1276, 1291–1292 (2d Cir. 1969).

■ 5. There is a total failure by plaintiff to prove the fact of reliance by anyone, any causal relationship between any defects in the proxy material and the Peoria sale, or that either Peoria or its shareholders sustained any injury.

■ 6. Defendants and their officers and directors stood in a fiduciary relationship to Peoria and its shareholders as a matter of law, and the burden thus rests upon defendants to prove that they acted in good faith and did not breach their fiduciary duty.

7. Defendants did act in utmost good faith toward Peoria and its minority shareholders. They sustained their burden of proving the fair market value of Peoria's assets and that ACI paid full reasonable value therefor.

■ 8. A parent corporation has no legal duty to guarantee the credit of any subsidiary.

9. The alleged corporate opportunity of Peoria to own and operate the new cold storage facility did not exist as a matter of law. The evidence conclusively proves that Peoria never possessed that corporate opportunity because it was at all times financially unable to embrace the same. 19 Am.Jur.2d § 1313, p. 720.

10. The plan of reorganization was legally adopted by the boards of directors of both Peoria and ACI and by the shareholders of Peoria.

11. The exchange ratio of five shares of Peoria stock for one share of ACI stock, which was established in the plan, was fair and reasonable to Peoria, to ACI, and to the shareholders of both.

12. There is no wrong here requiring or deserving rectification. To require "unscrambling" or some payment or further issue of stock to plaintiff or anyone he represents, or to his counsel, because of harmless deficiencies in the notice of meeting, would be a grave injustice to the other shareholders of ACI.

13. Plaintiff is entitled to take nothing on his own behalf, on behalf of Peoria, or on behalf of any member of the class of persons heretofore held to be similarly situated.

14. Defendants are entitled to judgment upon the complaint and for their costs of suit.