## LEBOLD et al. v. INLAND S. S. CO.

### No. 5694.

Circuit Court of Appeals, Seventh Circuit.

March 18, 1936.

352

Silas H. Strawn, Frank H. Towner, and Raymond O. Mitchell, all of Chicago, Ill., for appellants.

Carl Meyer, Frederic Burnham, and Herbert A. Friedlich, all of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Appellants, minority stockholders of appellee, brought this suit to enjoin appellee from taking any steps to dissolve or to discontinue its corporate existence or any other action tending to interfere with the usual operation of its business. Appellants claimed that the acts of appellee, its directors and its majority stockholder, the Inland Steel Company, were such as wrongfully to coerce appellants and to bring about legal injury to them as minority stockholders. Appellee filed its answer, and, upon hearing, the court dismissed the bill for want of equity. This appeal followed.

Appellee, incorporated in 1911, having an outstanding capital stock of 1,600 shares, each of the par value of $100, owns and operates three steamships on the Great Lakes. Prior to May, 1935, the Inland Steel Company owned 67.5 per cent. of appellee's stock, and since that time has owned 80 per cent. thereof. Appellants own 295 shares, formerly held by their father, one of the original incorporators. P. D. Block is president and C. B. Randall the vice president of both appellee and the Steel Company. L. E. Block is chairman of the board of the Steel Company. L. E. Block, P. D. Block, C. B. Randall, and one of appellants comprise appellee's board of directors. A former additional director resigned when he sold his stock to the Steel Company. Thus three of appellee's executive officers and four directors are likewise executive officers and directors of its majority stockholder, the Steel Company.

Appellee's business is derived almost entirely from the Steel Company, for which it carries ore, coal, and stone. For several years preceding 1935, dividends of $150 per share were earned and paid, over and above all deductions for interest, deprecia-

tion, bond amortization, and other charges. The average earnings, for the years from 1925 to 1934, were $134 per share and the average dividends $103 per share. If we could capitalize the earnings upon the basis of a 6 per cent. return, the value of the shares during those nine years would have been over $2,000. Upon a capitalization of the dividends upon the same basis, the value would be over $1,700 per share. The net earnings have increased as the bonded indebtedness, now $220,000, has been reduced, and for the year 1935, up to the time of the trial, equaled those in the preceding year. There was no express contract between the two companies, but the tonnage was carried by original arrangement, succeeded by tacit understanding, at the going or market rates, which are not governed by statute but are the result of competition.

On December 21, 1934, at the annual stockholders' meeting, the subject of minority holdings for the first time was presented, when P. D. Block announced that the Steel Company had had in mind for some time the purchase of such interests. He appointed Randall and McGean, an officer of the Pioneer Company, which likewise carried freight for the Steel Company, as a committee "to fix the value" of appellee's ships. Appellant F. M. Lebold, learning in the following January of the Steel Company's desire to acquire the minority stock, called upon Block, and was told that the committee had been appointed. In March Randall discussed with the other appellant the purchase of minority interests, saying that in arriving at a valuation earnings could not be considered; that, if the Steel Company should put the ships to hauling coal, they would earn nothing; that, if appellee should meet the lower rates being quoted by some companies, it would earn nothing; but he said, further, that the Pioneer Company had not been required to meet such lower rates.

On May 14, 1935, the committee appointed for the purpose of fixing the value of the ships submitted its report, stating that the Steel Company had said it was unwilling to continue placing traffic with appellee on the then prevailing terms, and that the committee had been appointed to consider the proposal of the Steel Company "to buy the minority stock" and recommending that such stock be "offered at the price of $700.00 per share." It did not report on the value of the ships. It devel-

oped that the price recommended had, in fact, been fixed by Randall, who occupied the dual position in the two companies previously mentioned. Block stated that the desire to buy was based upon possible merger of the Steel Company with others, the possibility of enactment of a law discriminating against companies not owning their own vessels, and the fact that other shippers were transporting their freight for less money. It was not shown at any time, however, that lower rates had been actually available to the Steel Company. Randall candidly stated that, if minority stockholders did not sell at $700, the Steel Company, as majority stockholder, would undertake to dissolve appellee, sell its ships, and distribute the proceeds. He testified that the Steel Company would pay no more than necessary, that it would bid enough to realize $700 per share, but that, if a better bid should be made, it would be accepted.

Appellants said that they preferred not to sell; that they objected to selling at $700 per share; but that they would not refuse to sell at a fair price. Block and Randall, representing the Steel Company, refused to make any further offer or to arbitrate the value of appellants' stock. Appellants called Randall's attention to the fact that he and Block were officers of both companies, and Randall replied that, when he dealt with traffic problems, he had at heart the interests of the Steel Company, and that, in his opinion, the Steel Company had been "suckers" and had acted foolishly in permitting the minority to continue to participate in the profits.

Following appellants' refusal to accept the offer and refusal of the Steel Company to arbitrate, notice was given of a special meeting of appellee's board of directors on July 23, 1935, to act upon a resolution to pay a liquidating dividend from the liquid assets, and of a special meeting of the stockholders to consider the proposed di solution. Thereupon appellants filed suit to restrain the action contemp and a restraining order was entered meetings were held, but no defini was taken. Block advised appe he did not see how appellants anything by their action, bec won, there was nothing to Steel Company from placing elsewhere. Randall testified th tive actuating the Steel Compa desire to avoid continuing paying to the minority. He designated su

ments as pouring "a golden stream to the minority stockholders." This, he said, "disturbed him and was unfair to the Steel Company." Admitting that the Steel Company received the greater part of the dividends, he said, "I have my eye on the part that we do not get," and that, since appellants had declined the offer of $700 per share, he had made up his mind definitely that no more traffic would be given to appellee; that this action would result in loss by appellee, which in turn would force dissolution and liquidation. He said these statements were not made in order to coerce appellants, but to advise them of what he had in mind, and that the purpose of the Steel Company was to produce economy in transportation expense by chartering ships at a flat rate, or procuring lower rates from other carriers, or purchasing its own ships, thus assuring to itself all profits resulting from transportation. He had made no computations, however, upon any of these bases, but said that there was a surplus of ships upon the Great Lakes.

The District Judge stated the law as being that, in the absence of actual fraud, a statutory percentage of stockholders may dissolve a corporation regardless of motive; that the stockholders of the Steel Company would have been justified in insisting that the situation be terminated; that the contemplated action would not effectuate a fraud upon the minority stockholders, but would bring about a pro rata distribution of assets. Pointing out that 20 per cent. of the money earned by the transportation of the Steel Company's freight was going to minority stockholders, he held that the action of the Steel Company was for its best interests; that its declared conclusion to terminate its traffic relations with appellee had been reached in good that, in fixing the value of stock, the record could not be consid offer was fair; that, if it med that the Steel Compa to terminate its traffic ar h appellee, it would be to the of all stockholders to dissolve

arties are not greatly in dispute v. A West Virginia corpora dissolved upon vote of 60 per shares of its capital stock, re motive and expediency. Ma holders do not, by mere reason holdings, thereby become trustees minority stockholders under any.

and all situations. However, the circumstances may be such that equity will impose upon them the obligations of trustees because of their conduct. In forcing disposition of assets, they may not overreach the minority stockholder and derive benefit from disposition of the assets, to the detriment of the minority stockholder, without being liable for the deprivation thus incurred by the latter. The minority must receive its pro rata share of the common property and the fruits of the capital investment. Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099; Jones v. Missouri-Edison Electric Co. (C. C.A.) 144 F. 765. And if, as a result of action by the majority, the latter reaps a benefit from the assets in which the minority does not share, the latter has its remedy against those thus illegally profiting at its expense, and they may be compelled to make restitution. Jones v. Missouri-Edison Electric Co., supra. Thus the majority may not force a sale to itself at less than the full value. Ervin v. Oregon Ry. & Nav. Co. (C.C.) 27 F. 625. Stated otherwise, the action of the majority must be fair to the corporation, and to all stockholders thereof, for the majority becomes in effect the corporation itself and charged with the trust obligations thereof. Ervin v. Oregon Ry. & Nav. Co. (C.C.) 27 F. 625. The judgment of the majority is not to be interfered with, in the absence of circumstances creating a fiduciary relationship as mentioned or effectuating a fraud upon the minority, but in examining the facts the chancellor must scrutinize them carefully. Ervin v. Oregon Ry. & Nav. Co., supra. In short, a court of equity may not interfere with the statutory right of the majority to force dissolution and sale of the assets unless the evidence discloses an unfair advantage over the minority stockholders, with resulting injury to the latter, which they are powerless to prevent.

■ In the trial court below, the three officers occupying dual positions with the two companies protested their good faith in what was contemplated, presented the reasons back of their action, and disclaimed any intention to benefit at the expense of the minority. They admitted that the step toward dissolution was impelled by their failure to procure the minority stock at the price fixed by themselves, but they insisted such price was fair. It is not contended that they proposed directly to appropriate the minority stockholders' pro rata share of the assets, but it is insisted that the whole project was part of a plan to force liquidation of the physical assets of a going prosperous concern and get rid of the minority stockholders by paying them the proceeds of their share of such assets, but leaving them without any of the fruit of their investment in the way of capitalization of earnings.

It seems to us, in view of all the evidence, that not all the essentials necessary to a complete case on the part of appellants are present. There has as yet been no disposition of the assets or loss to the minority. We cannot say that there will be any such loss. Thus far, the majority, though it has admitted its motive, has done only that which the statute permits it to do, call a meeting for dissolution. This it has a legal right to do. It may proceed to a dissolution, but what will happen then or thereafter is not now before the court, and cannot now be made the basis for a finding of fraud. On the record the bill was premature, and the court below rightfully held that the evidence does not make a case within the principles which we have outlined above.

However, we do not mean to imply that the circumstances that may hereafter develop, taken in connection with what has developed, may not bring appellants within that line of authorities which recognizes a right of action for an unfair advantage taken by a majority. Though the court was justified in holding that the facts thus far do not amount to fraud, it by no means follows that what may develop in the future may not bring about such an injury to appellants as will justify a renewal of their appeal to the chancellor.

■ The Steamship Company is controlled, and throughout all its existence has been operated and managed, by the majority stockholder, the Steel Company. The directors, motivated by human instincts, tempted by human impulses, under their own testimony, quite obviously have their first interest in, and make their first devotion to, the dominant company. The Steamship Company is a mere incident to the Steel Company's business, and there devolves upon the latter, therefore, as a result of this relationship, the burden of the utmost of scrupulous fair dealing with the minority of the incidental company. Thus in Jones v. Missouri-Edison Electric Co. (C.C.A.) 144 F. 765, at page 771, the court said: "A majority of the holders of stock owe to

the minority the duty to exercise good faith, care, and diligence to make the property of the corporation in their charge produce the largest possible amount, to protect the interests of the holders of the minority of the stock and to secure and deliver to them their just proportion of the income and of the proceeds of the property. Any sale of the corporate property to themselves, any disposition by them of the corporation or of its property to deprive the minority holders of their just share of it or to get gain for themselves at the expense of the holders of the minority of the stock, becomes a breach of duty and of trust which invokes plenary relief from a court of chancery."

The present case illustrates the possible evils arising from interlocking directorates. When, at a stockholders' meeting of the Steamship Company, a majority thereof voted for a dissolution of the corporation, in what capacity were they voting? By what desire were they motivated? The interests of which corporation were they promoting? They certainly were not casting their ballot for promotion of their own interest as stockholders of the Steamship Company, because by their ballot they were voting to put out of business and liquidate in a time of shipping depression a prosperous, going concern which had been paying 150 per cent. dividends upon capital investment, even in years of such depression. No benefit could accrue to the Steamship Company or its stockholders from the liquidation of its physical assets. What, then, was the guiding motive of the majority stockholders? Ordinarily we would say it was the desire to promote their interests as stockholders and directors of the Steel Company by bringing about 100 per cent. ownership of the Steamship Company in the Steel Company and thereby eliminating the minority stockholders and, perhaps, continuing the prosperous business of the Steamship Company.

There was at the stockholders' meeting and at the directors' meeting nobody interested in representing, protecting, or promoting the interests of the Steamship Company other than minority stockholders. Appellee was without that devoted representation to which it is entitled from its directors. It was without directors attempting to protect its corporate business. Clearly, from their own evidence, the majority were representing only the Steel Company.

It was said by the directors, who are also the directors of the Steel Company, that the latter will take away the business of the Steamship Company; but it should be remembered that, if it does so, it will thereby wipe out profits, 80 per cent. of which belongs to it, or, if it becomes the owner of all the assets of the latter, 100 per cent. It is not certain that other boats may be had at cheaper rates. It may be that cutthroat competition has reduced shipping rates, but those paid in preceding years are the prevailing or going rates; any lower rates are less than prevailing market rates; and the Steel Company has not in the past procured the offer of any cheaper rates.

The directors of the Steel Company, who purport to represent also the stockholders of the Steamship Company, say that some of the boats will not draw the full tonnage possible with the new channels. The fact that deeper boats may be employed does not disqualify or put out of business the boats of the Steamship Company. It may make them less efficient in competition with other boats, but there is no showing that the other boats on the lakes, now out of employment, which might be purchased and used, are not equally inefficient.

We would be more favorably impressed by the protestations of good faith of appellee's officers had they in their capacity of representatives of the dominant company shown a willingness to submit to arbitration the value of appellants' minority stock. The majority stockholder may believe that it is entirely fair, but its position renders impartiality difficult, for it is compelled to say, "Let not thy right hand know what thy left hand doth." In view of the frankly admitted desire of the majority to acquire the stock of the minority, its frank confession that the payment of profits to the minority brings only chagrin and dissatisfaction to the majority, the threat that, unless the minority will sell to it at its own price, it will force dissolution and liquidation of assets and thus produce an opportunity to purchase at a satisfactorily low market price all the physical assets, we confess to some doubt as to eventual results. That degree of fairness required of parties in a dominant situation, or of fiduciary representatives of corporations, or of majority stockholders to the minority, making legal duress impossible, must be present before a court of equity may rest quiescent.

We are of the opinion that the District Court erred in its conclusion that the price of $700 was a fair price for the stock of the minority, for the reason that the court concluded as a matter of law that, in determining the value, it should not take into consideration the earning record of the company. The determination of value entails necessarily consideration of all elements that enter into value—cost of physical assets, additions, depreciation and appreciation, market price, earnings, the chances of future successful operation, and prospects of continued earnings. From evidence as to all such elements, true valuation is to be determined. The stocks of many corporations sell for less than their book values, which ordinarily are cost, plus additions and appreciation, less depreciation and obsolescence. On the other hand, the stocks of other corporations sell for many times such value.

In view of our conclusions, it is not now necessary to determine the propriety of the District Court's ruling upon the application to make the Steel Company a defendant.

The court was justified in its conclusion that the presently developed circumstances are not such as to create a cause of action in appellants, and the decree, therefore, should be affirmed. But this affirmance and the dismissal by the court below will be without prejudice to the right of appellants hereafter to present the facts herein presented in connection with such further facts, if any, as bring about a situation within the doctrine recognizing causes of action in minority stockholders. With this modification the decree is affirmed.