475 F.2d 516
 Fed. Sec. L. Rep. P 93,811
Knute SWANSON, on behalf of Peoria Service Company, and on
behalf of all shareholders of Peoria Service
Company similarly situated, Plaintiff-Appellant,
v.
AMERICAN CONSUMERS INDUSTRIES, INC., a New Jersey
corporation, et al., Defendants-Appellees.
 No. 71-1639.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct 24, 1972.
Decided March 6, 1973.
Rehearing Denied April 16, 1973.
 
 Richard Orlikoff, Arthur T. Susman, Thomas D. Hanson, Chicago, Ill., Thomas V. Cassidy, Peoria, Ill., for plaintiff-appellant; Orlikoff, Prins, Flamm & Susman, Chicago, Ill., of counsel.
 Frank O. Wetmore, II, Edward J. Wendrow, John W. Stack, Chicago, Ill., Eugene L. White, Peoria, Ill., for defendants-appellees.
 Before CUMMINGS and SPRECHER, Circuit Judges, and KILKENNY, Senior Circuit Judge.[1]
 CUMMINGS, Circuit Judge.
 
 
 1
 Plaintiff is a stockholder of defendant Peoria Service Company (Peoria), a dissolved Illinois corporation that formerly operated two cold storage warehouse facilities in Peoria, Illinois. The complaint was brought derivatively on behalf of Peoria and also on behalf of plaintiff and all other similarly situated stockholders. In addition to the nominal defendant, Peoria, the complaint named as defendants United States Cold Storage Corporation (U.S. Cold), which owns 87 per cent of Peoria stock, and American Consumer Industries, Inc. (ACI), which owns 90 per cent of U.S. Cold stock. Plaintiff sought to rescind a 1965 reorganization agreement between Peoria and ACI which provided for the transfer of substantially all of Peoria's assets to ACI, an exchange of Peoria stock for ACI stock, and the liquidation of Peoria and to recover damages allegedly sustained by Peoria. The complaint asserted that the reorganization plan and related activities involved manipulative and deceptive devices and that the proxy materials were misleading and omitted to state material facts, in violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. Sec. 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. Sec. 240.-10b-5). Liability was also asserted under Illinois common law.
 
 
 2
 In August 1968, the trial court entered summary judgment for defendants. 288 F.Supp. 60. We reversed and remanded for trial, Judge Swygert dissenting. 415 F.2d 1326. After trial, the district court again rendered judgment for defendants. 328 F.Supp. 797. After setting forth 52 findings of fact, the court held that plaintiff must prove a causal relationship between the deceptive material and the Peoria sale, or that there was reliance upon the deceptive material and that the corporation or its shareholders were injured as a proximate result of the material. The court concluded that plaintiff had failed "to prove the fact of reliance by anyone, any causal relationship between any defects in the proxy material and the Peoria sale, or that either Peoria or its shareholders sustained any injury." 328 F.Supp. at 807.
 
 
 3
 In urging reversal, plaintiff first asserts that proof of a materially defective proxy statement used in connection with a transaction is sufficient to show a causal relationship between the violation and the transaction. Plaintiff also urges that he is entitled to relief under the common law of Illinois. Accordingly, plaintiff insists upon rescission, restitution, or other suitable relief, plus an award of attorneys' fees. Since the facts are fully stated in our prior opinion and in the two opinions below, they will not be restated herein.
 
 
 4
 Subsequent to our first opinion in the case, the Supreme Court rendered its opinion in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593, reversing 403 F.2d 429 (7th Cir. 1968). In that case the plaintiffs complained that the wrong accomplished through the use of a materially false or misleading proxy statement was the effectuation of a corporation merger. The Court held that if the proxy solicitation was an essential link in the accomplishment of the transaction, a showing of materiality in the misstatement or omission of that proxy was sufficient to establish a causal relationship between the proxy statement and the merger. 396 U.S. at 384-385, 90 S.Ct. 616. However, in Mills approval of a substantial number of minority shareholders was essential to the accomplishment of the merger. 396 U.S. at 379, 90 S.Ct. 616. In this case, ACI through U.S. Cold controlled a sufficient number of shares to approve the transaction without any votes from the minority. It was precisely in such a case that the Supreme Court refrained from deciding whether merely by demonstrating materiality, causation would be shown between the false or misleading proxy statement and the accomplishment of the merger. 396 U.S. at 385 n. 7, 90 S.Ct. 616.
 
 
 5
 Insofar as plaintiff claims the merger itself was the injury, it may be that since ACI controlled a sufficient amount of shares to approve the merger regardless of the minority vote, causation between the deception and the injury has not been established. Laufer v. Stranahan, Jr., CCH Fed.Sec.L.Rep. p 92,617 (S.D.N.Y.1970).[2] Nevertheless, assuming (without deciding) causation is ipso facto established by a showing of materiality even in this situation, unscrambling the merger would be an inappropriate remedy in this case.
 
 
 6
 The Supreme Court expressly reiterated this Court's statement in our decision in Mills that "nothing in the statutory policy 'requires the court to unscramble a corporate transaction merely because a violation occurred."' 396 U.S. at 386, 90 S.Ct. at 622, quoting from 403 F.2d at 436. Further, the Supreme Court directed that in fashioning retrospective relief, "the federal courts should consider the same factors that would govern the relief granted for any similar illegality or fraud" and that "[o]ne important factor may be the fairness of the terms of the merger." 396 U.S. at 386, 90 S.Ct. at 622. Here the lower court found that "the exchange ratio of five shares of Peoria stock for one share of ACI stock, which was established in the plan, was fair and reasonable to Peoria, to ACI, and to the shareholders of both." 328 F.Supp. at 807. We cannot say that this finding, supported by particularized factual findings largely based on credibility determinations, was "clearly erroneous" within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure. Moreover, the lower court concluded that to require unscrambling "would be a grave injustice to the other shareholders of ACI." Id. Insofar as plaintiff shareholders seek relief in their derivative status, "while they do have a derivative right to invoke [Peoria's] status as a party to the agreement, a determination of what relief should be granted in [Peoria's] name must hinge on whether setting aside the merger would be in the best interests of the shareholders as a whole." Mills, supra, 396 U.S. at 388, 90 S.Ct. at 623. The district court, exercising "the sound discretion which guides the determinations of courts of equity," (id. at 386, 90 S.Ct. at 622), made the foregoing finding that setting aside the merger would not be in the best interests of all shareholders, and we are not inclined to find an abuse of that discretion.
 
 
 7
 With respect to any monetary recovery to the plaintiff shareholders predicated on the terms of the merger, we will again assume that a causal connection is established between the false or misleading proxy statements and accomplishment of the merger. But as in Dasho v. Susquehanna Corp., 461 F.2d 11, 30 (7th Cir.), certiorari denied, 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972), although this "would seem to require a finding of 'legal injury' caused by the violation, in this case that injury may not include any pecuniary loss."
 
 
 8
 Applying the analysis of Dasho, approval of the sale of assets and reorganization caused plaintiff shareholders "monetary injury only if (a) [Peoria] would have been better off with no merger at all; or (b) a more favorable exchange ratio would have been available if there had been full disclosure." Id. at 31. The district court found that "Peoria, during and prior to ACI control, was not a viable entity; that Peoria was unable, financially, to exploit the market available to it and unable to obtain such financing as was necessary for conversion of the corporation into a viable entity." 328 F.Supp. at 806. This finding is supported by ample evidence, and hence it is clear Peoria would not have been better off with no merger at all. As to the availability of a more favorable exchange ratio upon full disclosure, there was simply a failure of evidence to support a monetary recovery. What suffices to show causation of a legal injury-the merger-does not automatically show plaintiffs suffered compensable monetary injury. "[D]amages should be recoverable only to the extent that they can be shown." Mills, supra, 396 U.S. at 389, 90 S.Ct. at 624.
 
 
 9
 When this case was before us previously, the defendants contended that no injury could be shown because any corporate opportunities or going concern value of which Peoria shareholders might have been deprived are retained by them by virtue of their continuing equity position in ACI. We responded that "if the allegations of the complaint are proved, the Peoria shareholders were entitled to a more favorable exchange ratio than they were granted and may have had their equity position unfairly diluted." 415 F.2d at 1332. But the allegations of unfairness in the complaint were not proved. The district court found that ACI paid full reasonable value for Peoria's assets and that the exchange ratio of five shares of Peoria stock for one share of ACI stock was fair and reasonable to Peoria and its shareholders. 328 F.Supp. at 807. This is a case where monetary relief is appropriately "predicated on a determination of the fairness of the terms of the merger at the time it was approved." Mills, supra, 396 U.S. at 389, 90 S.Ct. at 624. The lower court having concluded that the terms of the merger were fair and reasonable at the time of the transaction, and we having concurred with that conclusion, the plaintiffs are not entitled to a retrospective revision of the merger terms.
 
 
 10
 Whether or not causation should be taken as established between the deceptive proxy statement and consummation of the merger, causation between the proxy statement and other injury claimed to have been suffered stands on an entirely different footing. As we said in our prior opinion, "The power to effect a given result certainly does not negative all possibility of injury resulting from the fraudulent or manipulative use of that power." 415 F.2d at 1331-1332. Particularizing the possibility of injury, we stated "[i]t may well be that the misstatements and omissions contained in the proxy statements caused some Peoria shareholders to approve the sale, thus losing their statutory appraisal remedies." 415 F.2d 1332.[3] See Ill. Rev.Stat.1971, Ch. 32, Sec. 157.73. Operating under this Court's decision in Mills v. Electric Auto-Lite Co., 403 F.2d 429 (7th Cir. 1968), we remanded the case for a factual determination of whether a causal relationship existed between the deficiency in the proxy statement and the loss of statutory appraisal rights. Under the Supreme Court's decision in Mills, causation and reliance are no longer factually-to-be-proven predicates to recovery. As most recently stated by a unanimous Supreme Court in Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741:
 
 
 11
 "Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384 [90 S.Ct. 616, 621, 24 L.Ed.2d 593] (1970); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (C.A.2 1968), cert. denied sub nom. Coates v. SEC, 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969); L. Loss, Securities Regulation, 3876-3880 (1969 Supp. to 2d ed. of Vol. 3); A. Bromberg, Securities Law, Fraud-SEC Rule 10b-5, pts. 2.6 and 8.6 (1967). This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact."[4]
 
 
 12
 Thus the plaintiff sellers who were defrauded in that case were entitled to damages measured by the difference between the fair value of what they received and the fair value of what they would have received had there been no fraudulent conduct. 406 U.S. at 155, 92 S.Ct. 1456.
 
 
 13
 Consequently, it is inescapable that plaintiff shareholders have proven all the elements required to impress liability on defendants under Section 10(b) of the Securities and Exchange Act and the Commission's Rule 10b-5 for loss of their informed ability to exercise their statutory appraisal rights. In such a posture the appropriate remedy is to restore to the plaintiff shareholders the opportunity to receive cash rather than ACI shares. Therefore, ACI must offer to each Peoria shareholder $3.55, the market value attributed to Peoria stock in the reorganization plan, for each share of Peoria stock held by such shareholder on March 31, 1965, together with legal interest from that date to the date judgment is entered by the district court. Any minority shareholders who exchanged Peoria shares must, of course, return an equivalent number of ACI shares exchanged in order to receive the cash. Plaintiff is also entitled to reimbursement of reasonable attorneys' fees in an amount to be fixed by the district court, of course taking into consideration the modest recovery achieved, but cognizant that pecuniary benefit is not the sole criterion for the award of attorneys' fees. See Mills v. Electric Auto-Lite Co., supra, 396 U.S. at 389-397, 90 S.Ct. 616; Dillon v. Berg, 351 F.Supp. 584 (D.Del. 1972).
 
 
 14
 With respect to plaintiff shareholders' claim that they are entitled to recover under the common law of Illinois for defendants' purported breach of their fiduciary duties, the lower court concluded that the defendants "sustained their burden of proving that the transaction was a good faith and entirely fair effort by defendants and their officers and directors to relieve all the shareholders of Peoria from the consequences of its impending failure and to enable all such shareholders to participate equitably and ratably in the exploitation of the cold storage market available in the area." 328 F.Supp. at 807. Because we find no adequate reason to set aside the factual findings underpinning the conclusion that defendants have not breached their fiduciary duties under Illinois laws, we affirm that conclusion.
 
 
 15
 Since a further trial of this action is not required, Rule 23 of this Court is inoperative, and the case will therefore not be reassigned to another judge.
 
 
 16
 Finally, it is ordered that (1) costs in this Court are taxable against the defendants; (2) the trial court's order allowing costs against plaintiff is reversed; and (3) costs in the trial court should be awarded to the plaintiff in an amount to be determined by that court.
 
 
 17
 Reversed and remanded for further proceedings not inconsistent herewith.
 
 
 18
 SPRECHER, Circuit Judge, concurring in the result of reversal but dissenting from the remedy upon remand.
 
 
 19
 The district court originally dismissed the class action aspects of the case and then rendered summary judgment for the defendants. 288 F.Supp. 60 (S.D.Ill.1968). This court reversed the class dismissal and the summary judgment and remanded for trial. We concluded that "these proxy statements were misleading in material respects and were deceptive as a matter of law." 415 F.2d 1326, 1331 (1969).
 
 
 20
 After a trial, the district court concluded that the plaintiff was required to prove "a causal relationship between the deceptive material and the [Peoria] sale, or that there was reliance upon the deceptive material . . . and . . . that the corporation and/or its shareholders were injured as a proximate result of the material." The court then found and concluded that plaintiff had failed "to prove the fact of reliance by anyone, any causal relationship between any defects in the proxy material and the Peoria sale, or that either Peoria or its shareholders sustained any injury." 328 F.Supp. 797 at 807. Under the circumstances of this case, the court was erroneous as a matter of law in regard to reliance and causal relationship, and was clearly erroneous as a matter of fact in regard to the injury sustained by the corporation and its shareholders. The court set up a series of unnecessary and unjustified roadblocks for the plaintiff.
 
 
 21
 Congress has provided that the securities laws,[1] as well as the antitrust laws,[2] may be enforced by private litigation. "In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws." Radovich v. National Football League, 352 U.S. 445, 454, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957). In fact, Congress intended fewer burdens for the private litigant in securities law cases than in anti-trust litigation.[3]
 
 
 22
 First, the district court erred as a matter of law in requiring proof of reliance under the circumstances of this case. This has been made crystal clear in two Supreme Court decisions, one prior and the other subsequent to the district court's judgment.
 
 
 23
 In Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970), the Court said:
 
 
 24
 "Where the misstatement or omission in a proxy statement has been shown to be 'material,' as it was found to be here, that determination itself indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote."
 
 
 25
 In Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972), the Court said at 153-154, 92 S.Ct. at 1472:
 
 
 26
 "Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."[4]
 
 
 27
 Second, the district court erred as a matter of law in requiring proof of causal connection under the circumstances of this case.
 
 
 28
 In Affiliated Ute Citizens, the Court said at 406 U.S. 154, 92 S.Ct. at 1472:
 
 
 29
 "This obligation to disclose and this withholding of a material fact establish the requisite element of causation of fact."
 
 
 30
 The "circumstances" of Ute establishing an "obligation to disclose" were that the defendants were market makers who "possessed the affirmative duty under the Rule to disclose this fact" to persons who were selling stock to or through them. 406 U.S. at 153, 92 S.Ct. at 1472. The circumstances of the present case were that the dominant and controlling shareholder was a fiduciary with an affirmative duty and obligation under Rule 10b-5 to disclose to the minority shareholders the facts which it omitted to disclose in the proxy materials. Lebold v. Inland Steel Co., 82 F.2d 351 (7th Cir. 1936) and 125 F.2d 369 (7th Cir. 1942).
 
 
 31
 The fiduciary relation exists whether the dominant and controlling shareholder controls through a 5% stock interest or a 95% interest. In Lebold, the governing West Virginia statute provided that a corporation could be dissolved upon a 60% vote "regardless of motive and expediency" and the defendant parent corporation there owned 80% of the shares of the corporation sought to be dissolved. 82 F.2d at 352, 353. Nevertheless, this Court said at 125 F.2d at 373:
 
 
 32
 "By its strategic position, by its dominant situation, . . . [the parent corporation] could and did force a sale, bid in the property itself and thereafter continue to operate the business as before . . .
 
 
 33
 ". . . The business was never interrupted, never curtailed, never modified but continued without interruption.
 
 
 34
 ". . . The socalled dissolution was a mere device by means of which defendant appropriated for itself the transportation business of the Steamship Company to the detriment of plaintiffs. That the source of this power is found in a statute, supplies no reason for clothing it with a superior sanctity, or vesting it with the attributes of tryanny."
 
 
 35
 Under the "obligation to disclose" standard of Affiliated Ute Citizens, the withholding of a material fact or facts, as here, established the requisite element of causation in fact.
 
 
 36
 Although it is unnecessary to proceed further, I also am of the opinion that the question left open in footnote 7 of Mills at 396 U.S. 385, 90 S.Ct. 616 should be answered affirmatively-that is, that causation should be conclusively established by the mere solicitation of votes whether or not management controls a sufficient number of shares to approve the transaction without any votes from the minority. To hold otherwise makes a mockery of the securities acts. The prime and obvious purpose of the disclosure provisions of the acts is to protect the investor from nondisclosure. To find that a certain kind of declarant, such as one who owns more than a specified percentage of the corporate shares, is exempt from full disclosure, is utterly self-defeating. Actually if there is any such quantitative test, it would be running in the opposite direction-that is, the greater the percentage of control by the controlling shareholder, the greater the protection required for the minority shareholders.
 
 
 37
 Subsequent to the Supreme Court decision in Mills, the Second Circuit concluded that the fortuitous circumstance that the majority shareholder has sufficient control to cause a statutory change cannot determine liability under Rule 10b-5. In Laurenzano v. Einbender, 448 F.2d 1, 5 (2d Cir. 1971), the court, affirming the district judge's finding that no material misrepresentations had been made, stated:
 
 
 38
 "The further argument, that Bargain Town shareholder approval was meaningless because National was now the majority shareholder, is irrelevant to the question of whether or not the existence of the option agreement had to be revealed in the proxy statement. And, of course, approval was not meaningless; minority shareholder approval has value whether or not it is strictly essential to the power to act."
 
 
 39
 The court in its earlier opinion in this case noted the importance of state or federal regulations requiring that proposals for change in a corporate entity be submitted to a vote of the shareholders, regardless of the number of votes controlled by management. We stated at 415 F.2d 1332:
 
 
 40
 "Confronted by the objections and potentially expensive appraisal rights of minority shareholders, the directors of Peoria and their alter egos, ACI and U.S. Cold, might well have chosen to alter the plan of reorganization or abandon it entirely. 'The vote is not legally predetermined simply because it seems practically predictable. * * * it is not legally possible to decide what legal consequences flow from the informational defects in the meeting by asserting that the meeting would have ended in the same resolutions no matter what the views or votes of the minority.' Laurenzano v. Einbender, 264 F.Supp. 356, 362 (E.D.N.Y.1966)."
 
 
 41
 Legal commentators agree with this analysis. See Note, "Causation and Liability in Private Actions For Proxy Violations," 80 Yale L.J. 107 (1970); Comment, "Shareholders' Derivative Suit to Enforce a Corporate Right of Action Against Directors Under SEC Rule 10b-5," 114 U.Pa.L.Rev. 578, 582-83 (1966); Kaplan, "Shareholder Attacks on Mergers and Acquisitions Under Federal Securities Laws," 50 Chicago Bar Rec. 441, 443-44 (1969).
 
 
 42
 Neither Section 10(b) of the 1934 Act nor Rule 10b-5 by their terms require any showing of a causal connection between misleading statements or omissions and resulting injury. The Supreme Court has cautioned repeatedly, most recently in Affiliated Ute Citizens, that the statute and the rule are to be construed flexibly to achieve their broad remedial purposes "to substitute a philosphy of full disclosure for the philosophy of caveat emptor." 406 U.S. at 151, 92 S.Ct. at 1471. Over thirty years ago in Lebold this Court pioneered a path out of the thicket of caveat investor and we should not be retrogressing this late in the day. Thus I would hold under both Affiliated Ute Citizens and under the open question in Mills, that if the dominant party with sufficient voting power to cause a corporate change is guilty of a material misrepresentation or nondisclosure and seeks shareholder approval,[5] it is conclusively presumed that the misrepresentation or nondisclosure caused both the corporate change (merger, consolidation, sale of assets, liquidation or reorganization) and any resulting monetary damages.
 
 
 43
 In order to place the district court's judgment in proper perspective, it is necessary to consider some of its other findings and conclusions. It concluded that "Defendants and their officers and directors stood in a fiduciary relationship to Peoria and its shareholders as a matter of law" and that the burden rested on the defendants to prove that they acted in good faith. The court then found and concluded that the "Defendants did act in utmost good faith toward Peoria and its minority shareholders." I believe that the court was clearly erroneous in finding that the defendants acted in good faith, that the record supports only the conclusion that they did not act in good faith, and that in any event it is immaterial whether they acted in good faith or not if the minority shareholders were in fact deprived of a going business through a fiduciary breach.
 
 
 44
 In this circuit, if not universally, scienter is not an element of proof in a Rule 10b-5 case. In S.E.C. v. Capital Gains Research Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), the Supreme Court, in a government enforcement case, held that Congress "did not intend to require proof of intent to injure" in the securities laws.[6] It would be anomalous to hold the plaintiff in a private enforcement case to a higher standard of proof.
 
 
 45
 In Ellis v. Carter, 291 F.2d 270, 274 (9th Cir. 1961), the court refused to restrict Section 10(b) to common law fraud and rejected a scienter requirement in view of the broad Congressional purpose revealed in the words "any manipulative or deceptive contrivance." In Affiliated Ute Citizens, the Supreme Court emphasized the repeated use of the word "any" in the section and in Rule 10b-5 to apply a broad interpretation of the securities acts.
 
 
 46
 We have repeatedly evidenced our adherence to the conclusions reached in Ellis. Kohler v. Kohler Co., 319 F.2d 634, 637 (7th Cir. 1963); Jordan Bldg. Corp. v. Doyle, O'Connor & Co., 401 F.2d 47, 50 (7th Cir. 1968). Cf. Parrent v. Midwest Rug Mills, Inc., 455 F.2d 123, 126 (7th Cir. 1972) (statute of limitations under Section 10(b) determined partially on basis that scienter need not be proved). In Kohler, Judge Swygert said at 319 F.2d 637:
 
 
 47
 "It is clear from such examination that the statute [Section 10(b) of the 1934 Act] was meant to cover more than deliberately and dishonestly misrepresenting or omitting material facts which ordinarily are badges of fraud and deceit."
 
 
 48
 Although scienter or lack of good faith is not required to prove a Rule 10b-5 case, the establishment of bad faith by the record in this case certainly affects the remedy to be applied for the injuries sustained.
 
 
 49
 The findings of the district court repeatedly emphasize that Peoria would have experienced no difficulty whatever in continuing as a going business if ACI or U.S. Cold would have been willing to guarantee the loan needed to construct a new cold storage warehouse (Findings 19, 20, 21, 22, 27; 328 F.Supp. at 801, 802). The court found that ACI had a "general policy" not to guarantee the credit of its subsidiaries other than in "exceptional situations" (801-802) and concluded that "a parent corporation has no legal duty to guarantee the credit of any subsidiary" (807).
 
 
 50
 Both New Jersey law[7] under which ACI was incorporated and Delaware law[8] under which U.S. Cold was incorporated permitted such guarantee, this was the exceptional case within the ACI general policy, and as a matter of both ACI internal benefit and ACI fiduciary duty to Peoria, ACI should have guaranteed Peoria credit. Since presumably the new cold storage warehouse would have been available to secure the loan, the risk on the guarantee would have been minimal. The ACI directors placed themselves in the dual capacity of owing fiduciary duties to both ACI and Peoria. The fiduciary duty to Peoria required the guarantee[9] and the fiduciary duty to ACI did not require the alternative which was actually followed of ACI wrongfully taking over the going business of Peoria.
 
 
 51
 The conflicting interests of ACI manifested themselves throughout the transaction. The district court found that ACI's chief executive officer, Robinson, "required, as a condition to the control acquisition agreement [to acquire control of Peoria], that Peoria exercise an option which it then held to purchase the Wilton Mortuary property" for $48,000. When ACI refused to guarantee Peoria's credit, it became expedient (in the judgment of the dual directors and officers) to sell the Wilton property for $33,500, a loss to Peoria of $14,500 because of "Robinson's requirement."[10]
 
 
 52
 No appraisal of Peoria's assets was obtained prior to the adoption of the plan of reorganization or prior to the special meeting of shareholders on March 31, 1965. Instead, Robinson, the chief executive officer of both ACI and U.S. Cold, and the board of directors of ACI determined that the "fair market value" of all "the assets, property, rights and business" of Peoria was $285,582.50.
 
 
 53
 It has become an almost routine procedure in mergers, recapitalizations and other corporate transactions, which may present a conflict of interest for insiders, to obtain an independent appraisal of values.[11] To accept the uncorroborated opinions of the very persons with the conflicts of interest, whose best interests were to value the Peoria business as low as possible, is like commissioning the fox to devise a survival plan for the chicken.[12]
 
 
 54
 When, having taken the Peoria corporate opportunity of building a profitable cold storage building, ACI constructed it for $1,318,581 and sold it to U. S. Cold for $1,586,405, a profit of $267,824, an appraisal was obtained. In other words, the dual officers employed a double standard-when ACI's assets were at stake, they used appraisals to obtain every cent of value for ACI but when Peoria's assets were involved, appraisals were eschewed and rough guesses by biased participants were deemed appropriate.
 
 
 55
 The ACI and U.S. Cold officers and directors did not observe the punctilio of an honor the most sensitive. There insensitivity led to injury by Peoria and its minority shareholders.
 
 
 56
 The options open to the defendants on March 11, 1965, were three: (1) they could sell Peoria as a going business to disinterested third persons, which they refused to do because it was too valuable a prospective business; (2) they could continue to operate it as a going business, which they refused to do because they felt that the obsolescence of its facilities reduced its ability to compete in the market place; or (3) they could reorganize or merge it on the basis of a going business. What they did and could not legally do was to buy out the business on a liquidation basis and then continue the going business for their own benefit with the minority holders participating as shareholders of ACI but on a diluted basis as the result of the inadequate consideration paid for the assets.
 
 
 57
 Peoria was a prosperous business. Its net-after-taxes profits after the ACI acquisition of control were (as taken from defendants' own records):
 
 
 58
 1961 $ 3,061 (P. Ex. 113)
1962 2,916 (P. Ex. 243)
1963 15,430 (P. Ex. 116)
1964 13,931 (P. Ex. 117)
1965 27,863 (D. Ex. 1)
 
 
 59
 Peoria had a net worth of $478,169.59 and $87,598.25 in cash on hand on March 31, 1965 (P. Ex. 118). Demands for its services exceeded its capabilities (Tr. 362-63).
 
 
 60
 ACI paid $285,582.50 for Peoria's assets (P. Ex. 122). This was less than the defendants' own computation of liquidation value or value of physical assets only, which was $307,407.97 (328 F.Supp. at 805).
 
 
 61
 In Lebold v. Inland S.S. Co., 125 F.2d 369, 374 (7th Cir. 1942), we said:
 
 
 62
 "Furthermore it seems to us that defendant may not be permitted to say that there were no values other than those of physical assets. By taking over the assets and by continuing the prosperous business of its former cestui trust defendant has removed itself from the place where it is permissible for it to contend that there is no prosperous business. That there was value over and above physical assets is perfectly obvious from the fact that a prosperous business existed and is still being conducted; that plaintiffs, if they had not been deprived of their interest, would be still sharing in the returns from that business and that at the present time all the profits of such are being enjoyed by defendant to the total exclusion of plaintiffs.
 
 
 63
 "It follows that the true rule for determination of the value of plaintiffs' interest must be based upon the value not of the physical assets alone but upon all the elements mentioned in our former opinion [82 F.2d 351] and in arriving at such value, all those elments, including value as a going concern, must be taken into consideration."
 
 
 64
 The elements of value were set forth in Lebold v. Inland Steel Co., 82 F.2d 351, 356 (7th Cir. 1936):
 
 
 65
 "The determination of value entails necessarily consideration of all elements that enter into value-cost of physical assets, additions, depreciation and appreciation, market price, earnings, the chances of future successful operation, and prospects of continued earnings."
 
 
 66
 The parties differed in their evaluation of the physical assets. Whereas the defendants argued that the value was $307,407.97, the plaintiff contended that it was $392,107.00. From the standpoint of a going business, the plaintiff's figure is correct: it includes $15,000 charged Peoria for liquidation expenses and the defendants' own computations (P.Ex. 119) of the going business value of equipment ($71,448.43) instead of a forced sale value ($3,000).
 
 
 67
 The only expert witness, William E. Stiegelmeier, a specialist in the valuation of closely-held companies, testified that the going concern value of Peoria at the date of sale was $473,000 or $5.80 per share. In arriving at this figure, he added the lower of the 20-25% value which he determined proper to ascribe to going concern value. This compares to the net worth or book value of $478,169.59, the "National Monthly Stock Summary" for March, 1965, indicating bids on the over-the-counter market for Peoria stock ranging from 4 1/2 to 5 3/8, and the profit situation cited above.
 
 
 68
 The only contrary evidence on behalf of the defendants was the liquidation figure of $307,407.97,[13] The $285,582.50 payment for the assets amounted to $3.55 per share of Peoria stock (328 F.Supp. at 803).
 
 
 69
 On the record before us Peoria's assets were undervalued by about 65% and each minority shareholder was injured to the extent of receiving ACI stock worth at least 65% less than his Peoria stock. Peoria was a relatively small company but the inadequacy of consideration is relatively great.
 
 
 70
 In my opinion this case comes very close to that equitable borderline where the relief to be fashioned should be rescission and an unscrambling of the merger. J. I. Case v. Borak, 377 U.S. 426, 433-434, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).
 
 
 71
 In S.E.C. v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Supreme Court permitted to stand an amended complaint by the Securities and Exchange Commission which sought "unwinding the merger and returning the situation to the status quo ante, requiring [the defendants] to make an accounting of their unlawful gains, and readjusting the equities of the various [defendants] in whatever companies survived the decree" because of misrepresentations of, and omissions to state, material facts in the proxy statement soliciting the merger of two insurance companies, despite the approval of the merger (and presumably of the fairness of its terms) by the State Director of Insurance. The Court emphasized that "the Federal Government is attempting to protect security holders from fraudulent misrepresentations" and "is asking . . . that . . . companies speak the truth when talking to their shareholders." In this context, "no question of the legality or illegality of the merger, standing alone, was raised", "the gravamen of the complaint was the misrepresentation, not the merger", and "the merger became relevant only insofar as it was necessary to attack it in order to undo the harm caused by the alleged deception." The Court concluded that "in these circumstances, there is no reason to emasculate the securities laws by forbidding remedies which might prove to be essential" and that "on remand, the trial court may order a return to the status quo ante if it finds that course of action desirable, necessary, and otherwise lawful."
 
 
 72
 In any event, if this transaction is not unscrambled, I would agree with Judge Cummings' conclusion of reversal, but I would assess damages on the basis that each Peoria shareholder is entitled to $5.80 per share together with legal interest from March 11, 1965 to the date that judgment is entered by the district court, or the equivalent in ACI stock, plus suitable attorneys' fees and costs.
 
 
 
 [1]
 Senior Circuit Judge John F. Kilkenny of the Ninth Circuit is sitting by designation
 
 
 [2]
 Compare the dictum in Laurenzano v. Einbender, 448 F.2d 1, 5 (2d Cir. 1971) and see the Supreme Court's discussion in Mills, 396 U.S. at 385 n. 7, 90 S.Ct. 616. Our prior opinion cannot be taken as intimating any view on this question. We were careful to distinguish between the situation where the merger itself was the alleged injury and the situation where other injury to the shareholders or the corporation is claimed to have resulted from the use of deceptive devices proscribed by Rule 10b-5. 415 F.2d at 1331
 One rationale for finding causation in a control situation would appear to be that if the majority finds it necessary for legal or practical reasons to solicit proxies from minority shareholders, it is possible that a full and accurate proxy statement disclosure could have enabled minority shareholders to take some action prompting the controlling shareholders to abandon the merger plan or alter its terms. Whether this possibility should per se be enough to support a finding of causation as a matter of law is questionable. In some cases this possibility will have little or no foundation in reality. While a determination that a misstatement or omission in a proxy statement is material "indubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote" (Mills, supra at 384, 90 S.Ct. at 621), it hardly embodies a conclusion that the non-controlling minority might have somehow, apart from their voting power, prevented the merger from taking place on the terms proposed. Even if it is salutary to presume they could, it is further questionable whether such a presumption would be justified in the face of proof by the defendants that the merger was fair and meritorious. While it may be "a dubious behavioral assumption * * * that the shareholders of every corporation are willing to accept any and every fair merger offer put before them" (id. at 382 n. 3, 90 S.Ct. at 620), it may be more dubious to assume that minority shareholders whose votes are unnecessary to the effectuation of a merger would have some extra-proxy power to prevent or alter the terms of a merger which the majority has proven was fair and had merit.
 Another rationale would be to posit that statutory purpose requires that the orthodox standard of causation in tort law should be cast aside entirely. While this position may have merit, it requires a court to go so far as to ignore the corporate power structure and the fairness and merit of a transaction effectuated by those in control whenever a defective proxy statement is used, and it is not so clear that these factors are undeserving of consideration on the causation issue.
 
 
 [3]
 We also stated that the presence of a controlling shareholder does not "negative as a matter of law the possibility of injury to the corporation, which may be remedied by means of a derivative action", and we noted plaintiff's allegations that Peoria was being raided and its assets squandered while its principal shareholder usurped Peoria's corporate opportunities. 415 F.2d at 1332. But the district court justifiably concluded these allegations were not sustained. The trial judge found Peoria incapable of embracing the corporate opportunities alleged to have been usurped and specifically found no evidence was adduced to substantiate the allegations of raiding and squandering Peoria's assets. Indeed, he found quite the contrary of the allegations to be fact
 
 
 [4]
 Mr. Justice Douglas joined in this part of the opinion, although he dissented from the holding that there was no liability on the part of the United States
 
 
 [1]
 J. I. Case Company v. Borak, 377 U.S. 426, 431-432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)
 
 
 [2]
 Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 751-752, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947) (Robinson-Patman Act); Radovich v. National Football League, 352 U.S. 445, 453-454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) (Sherman Act); Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 318-319, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965) (Clayton Act)
 
 
 [3]
 Section 16 of the Clayton Act (15 U.S.C. Sec. 26) provides that "any person . . . shall be entitled to sue for and have injunctive relief, . . ." and Section 15 (15 U.S.C. Sec. 25) which covers equitable actions by the United States provides that "proceedings may be by way of petition . . . praying that such violation shall be enjoined or otherwise prohibited." Judge Learned Hand held in Graves v. Cambria Steel Co., 298 F. 761 (S.D.N.Y.1924) that the difference in language permitted dissolution or divestiture in a government action but not in a private action
 On the other hand, Section 27 of the Securities Exchange Act of 1934, under which the present cause of action is brought (15 U.S.C. Sec. 78aa) provides in part that "the district courts . . . shall have exclusive jurisdiction . . . of all suits in equity and actions at law brought to enforce any liability or duty created by this title. . . ." A broader grant of jurisdiction cannot be conceived.
 
 
 [4]
 Prior to the district court judgment in the present case, we had held that in government prosecutions under Section 17(a) of the Securities Act of 1933 "it is unnecessary to prove that a victim parted with money or property in reliance upon misrepresentations." United States v. Amick, 439 F.2d 351, 366 (7th Cir.), cert. denied, Irving v. United States, 403 U.S. 918, 91 S.Ct. 2227, 29 L.Ed.2d 694 (1971), Vollmer v. United States, 403 U.S. 932, 91 S.Ct. 2255, 29 L.Ed.2d 710 (1971), 404 U.S. 823, 92 S.Ct. 48, 30 L.Ed.2d 51 (1971). Earlier, in Kohler v. Kohler Co., 319 F.2d 634 (7th Cir. 1963), we affirmed 208 F.Supp. 808, at 824 (E.D.Wis.1962), where the court said in a Rule 10b-5 case under the Securities Exchange Act of 1934, that "it is not necessary that plaintiff have relied exclusively upon the defendants. . . ."
 
 
 [5]
 "Even when it has control, management may, for legal or practical reasons, solicit proxies. A solicitation requirement may be imposed by stock exchange rule or by federal statute. Furthermore, many corporations, acting under state corporation laws, may set up additional solicitation requirements in their certificates of incorporation or by-laws. Once management does solicit proxies, further rules apply. Moreover, as a strategic matter, management may wish to solicit proxies to give shareholders a sense of participation and thereby forestall litigation over projected corporate action. It may also wish to prevent the exercise of appraisal rights (which might drain the corporation's liquid assets) by securing shareholder approval in order to retain sufficient cash to make the merger desirable to the other corporation." Note, "Causation and Liability in Private Actions For Proxy Violations," 80 Yale L.J. 107, 114 (1970)
 
 
 [6]
 We held in another government enforcement case that "under Sec. 17(a)(2) and (3) proof of scienter or fraudulent intent is not essential in a suit for injunctive relief." S. E. C. v. Van Horn, 371 F.2d 181, 186 (7th Cir. 1966)
 
 
 [7]
 Jesselsohn v. Boorstein, 111 N.J.Eq. 310, 162 A. 254 (1932); Hall v. Pauser, 128 N.J.L. 211, 24 A.2d 575 (1942); N.J. Stat.Ann., Sec. 14A:3-1(f) and (g)
 
 
 [8]
 Del.Code Ann., Title 8, Sec. 123. See also, 6 Fletcher Cyc. Corp. (1968 Rev.Ed.) Sec. 2593, p. 670: "It would seem that where one corporation owns and controls another corporation, the former may guarantee the debts of the latter when the purpose is to protect its own interest."
 
 
 [9]
 The guarantee would only be required, of course, if the ACI directors opted to continue the going business with a new warehouse and, as here, the only way to obtain it was through a guarantee; the alternatives were to sell Peoria as a going business in an arms-length transaction to third persons or to continue the going business without the new warehouse
 
 
 [10]
 Findings 13, 37; 328 F.Supp. at 800, 804. Due to depreciation, there was a bookkeeping and tax gain on the sale of the Wilton property, but this was also detrimental to Peoria since while the depreciation reduced current taxes slightly, it also operated to reduce Peoria's profits, which were one measure of its value as a going business
 
 
 [11]
 Mills v. Electric Auto-Lite Co., 403 F.2d 429, 435-436 (7th Cir. 1968) ("research consultants made an independent study" of relative values); Richland v. Crandall, 262 F.Supp. 538, 554-555 (S.D.N.Y.1967) (retention of First Boston Corporation to make study of fair price of assets as a going concern as well as appraisals); Miller v. Steinbach, 268 F.Supp. 255, 261 (S.D.N.Y.1967) (opinion of Goldman, Sachs & Co. as to fairness of merger terms); 2 Bromberg, Securities Law, Sec. 12.10(4), p. 288.2
 
 
 [12]
 "We would be more favorably impressed by the protestations of good faith of appellee's officers had they in their capacity of representatives of the dominant company shown a willingness to submit to arbitration the value of appellants' minority stock. The majority stockholder may believe that it is entirely fair, but its position renders impartiality difficult, for it is compelled to say, 'Let not thy right hand know what thy left hand doth."' Lebold v. Inland Steel Co., 82 F.2d 351, 355 (7th Cir. 1936)
 
 
 [13]
 In order to avoid the $473,000 going-concern-value figure, the district court found that "Peoria was a losing venture." which was belied by defendants' own books and records. The qualified expert's testimony was discredited whereas McCausland, ACI's man, who was originally responsible for most of the Peoria decisions in an inherent conflict-of-interest situation, was credited when he testified in support of his own decisions. In fact the record could support only the going business valuation and McCausland, regardless of his credibility, did not purport to give such a valuation